JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-Appellant, John Ferguson ("Appellant"), appeals from his conviction for theft. For the reasons set forth below, we affirm.
 {¶ 2} On February 12, 2004, the Cuyahoga County Grand Jury indicted Appellant along with two co-defendants, Larry Jennings and Roger Hines, on one count of theft of property or services being $500 or more, but less than $5,000, in violation of R.C.2913.02 and a fifth-degree felony. Appellant pled not guilty to the indictment.
 {¶ 3} Appellant's case proceeded to trial on March 14, 2005. At trial, the State presented the following seven witnesses: Albert Walcutt, Derek Manley, Earnest Kinney, Fred Cassell, Benny Strozier, Andrew Kuzar and Joseph Roth.
 {¶ 4} Albert Walcutt testified that he is President of MPC Group ("MPC), a company that performs chrome plating onto various small parts, such as faucets, door handles, automotive parts and water filter covers. He explained that the company deposits copper, nickel and chrome on these plastic parts to make them more durable and aesthetic.
 {¶ 5} Walcutt also explained the procedure MPC follows in storing the nickel. Immediately upon receipt, the nickel, which is quite expensive, is placed into a locked storage area. The nickel is also recorded into an inventory sheet and MPC calculates the usage in the plating lines in order to account for all the nickel purchased. Finally, once a week during the shutdown shift, the engineers calculate the quantity of nickel needed to replenish the plating line.
 {¶ 6} On or about October 30, 2003, employees of MPC found two boxes of nickel anodes, also known as small pieces of high-purity nickel, outside the back door of the plant, near a trash dumpster. He found this quite alarming, as he has never permitted his employees to remove the nickel from the plant or to place the nickel in the dumpster. Walcutt returned the nickel to the plant.
He then summoned all MPC employees to a meeting and informed them of his findings, that he suspected a thief within the group, and cautioned the employees that if the theft continued, the thief would be prosecuted. Walcutt specifically remembered Appellant and Roger Hines being present during this meeting.
 {¶ 7} One week after the meeting, on November 6, 2003, the next shutdown day, Walcutt discovered two more boxes, or 88 pounds, of nickel missing. The following day, Cornell Nash, a supervisor from the metals plating operation approached Walcutt. From this conversation, he began interviewing Derek Manley and Earnest Kinney with regard to the disappearance of the nickel from November 6, 2003.
 {¶ 8} Walcutt then waited one week until shutdown day again and brought out the nickel, following the exact routine that he identified earlier. Appellant and Hines were the two assigned to handling the nickel on the deck as they had done before. On that day, one of the engineers discovered two five-gallon pails on the deck that contained nickel on the bottom with plastic scraps covering the nickel. Walcutt testified that the pails usually contained only plastic and under no circumstances would nickel be placed in the pails. After discovering the pails, the engineer watched the pails closely. The next morning, the pails were discovered in a 55-gallon trash drum, which Larry Jennings, the janitor, later removed from the plant. According to Jennings, the pails with nickel and plastic scrap were later placed into the dumpster by Hines.
 {¶ 9} Once Walcutt discovered the pails in the dumpster, he asked Dorey Walker to watch the dumpster from across the street. Additionally, Walcutt retrained a video camera on the area of the dumpster. The video showed that around 6:00 p.m. a white vehicle drove around the block twice and pulled in view of the camera. Two people exited the vehicle. One individual was identified as Hines and the other could not be specifically identified.
 {¶ 10} The day after viewing the video, Walcutt asked Appellant, Larry Jennings and Hines to come into the office to discuss the nickel thefts. At that time, Walcutt, along with Andy Kuhar, the Chief Financial Officer of MPC, Fred Cassell, Production Manager, and Benny Strozier, Buffing Supervisor, interviewed the three men separately regarding the theft. Walcutt informed the men that he had information indicating their involvement in the nickel theft, asked for their cooperation in the matter, and shared with them the evidence implicating them in the theft.
 {¶ 11} Walcutt testified that he, along with the other three men of MPC previously mentioned, interviewed the Appellant regarding the theft. During the interview, Appellant denied stealing or removing any nickel from the company. Instead, he maintained that on November 6, 2003, he drove Hines, per his request, to a scrap dealer so Hines could sell the nickel. At the scrap dealer, Hines sold the nickel and paid Appellant $40 for the transportation.
 {¶ 12} After speaking with Appellant regarding the incident, Andy Kuhar typed a written statement of the information provided by Appellant. When presented with the typed statement, Appellant confirmed its authenticity. Appellant, however, refused to sign the statement without Walcutt's assurance not to prosecute Appellant. Walcutt denied Appellant's request. Soon thereafter, Appellant left the plant.
 {¶ 13} Walcutt also testified as to the value of the stolen nickel. The first batch, stolen on October 30, 2003, weighed 88 pounds and was purchased at $5.25 a pound, for a total of $462. The next batch of nickel, stolen on November 6, 2003, weighed 88 pounds as well, but was purchased for $6.05 a pound, for a total of $532.40. The last batch that was recovered on November 12, 2003, weighed 108 pounds and was also valued at $6.05 a pound, for a total of $653.40. The State presented the invoices to verify Walcutt's testimony.
 {¶ 14} Derek Manley was next to testify and stated that he was working the first shift for MPC during October and November 2003. He then testified that on November 6, 2003, he and Earnest Kinney were at the bus stop on the corner of 65th Street and Euclid Avenue when he observed Appellant's white Buick pull to the side of the MPC plant and back into the driveway. He then noticed someone exit the vehicle and load the trunk with boxes retrieved from the dumpster. He explained that he was about 75 feet from the dumpster when he witnessed this incident. He also witnessed Hines exit the building, help close the trunk, and enter the vehicle. Additionally, he saw Larry Jennings at the dumpster at the time of the incident. The next day, Manley informed his supervisor, Cornell Nash, of his observations.
 {¶ 15} Earnest Kinney testified that he also worked the first shift at MPC on November 6, 2003. On that day, he was at the bus stop across from MPC when he noticed a white car pull up and back into the rear drive of the building. He witnessed someone exit the vehicle, obtain boxes from the dumpster area, and load the boxes in the trunk of the vehicle. He then observed Hines come from the plant and enter the vehicle. Kinney testified that he was not able to recognize the man driving the vehicle. The following day, Kinney informed his supervisor, Cornell Nash, of the incident.
 {¶ 16} Fred Cassell testified that he worked for MPC as the Production Manager on November 12, 2003. On that day, he was present during the interview of Appellant regarding his alleged involvement in the theft of nickel. Al Walcutt, Andy Kuhar and Benny Strozier were also present at the interview.
 {¶ 17} During the interview, Cassell testified that Appellant stated that Hines had asked him for a ride at the end of the workday. Appellant agreed and pulled his vehicle by the dumpster outside the plant. Appellant admitted that the two loaded some containers into his vehicle. Hines further asked Appellant to transport him to the scrap metal dealer. Appellant did so. Upon arrival, Hines took the containers from the vehicle into the scrap metal dealer. When he returned, Hines paid Appellant $40.
 {¶ 18} After Appellant finished his statement, Cassell, Walcutt and Strozier remained in the room with Appellant while Kuhar exited. Kuhar returned with a typed statement of the Appellant's interview. Cassell explained that Appellant refused to sign the statement because Walcutt declined to assure Appellant that he would not be prosecuted.
 {¶ 19} Thereafter, Walcutt, Kuhar and Strozier exited the room. While Cassell was alone with Appellant, Appellant refused to stay and Cassell followed him out of the building.
 {¶ 20} Benny Strozier testified that he worked as the Buffing Supervisor during November 2003. Strozier testified that he was outside the MPC buffing department building when he saw Appellant and Hines sitting in a white vehicle across Euclid looking toward the other MPC building. He, therefore, went inside and retrieved Cornell Nash to show him the vehicle. The two were standing on the dock on 63rd Street when they witnessed Appellant and Hines drive around the block twice. Strozier did not see anything else occur.
 {¶ 21} Strozier also testified that he, Fred Cassell, Andy Kuhar and Al Walcutt were present during the Appellant's interview regarding the stolen nickel. He recalled that Appellant was asked about the theft at MPC, to which Appellant responded that he transported Hines to the scrap yard and that Hines gave him $40 for the ride. Additionally, Strozier testified that Kuhar typed Appellant's statement and that Appellant refused to sign the statement because Walcutt did not agree to not prosecute Appellant.
 {¶ 22} Andrew Kuhar testified that he is the Chief Financial Officer at MPC. He recalled that he participated in the investigation of the theft of the nickel on November 13, 2003, along with Fred Cassell, Benny Strozier and Al Walcutt. Kuhar testified that Appellant admitted he drove Hines to the scrap yard and received $40 from Hines for the transportation. Kuhar further testified that Appellant acknowledged he was aware that the two boxes of nickel were stolen.
 {¶ 23} Kuhar took notes of the interview, and immediately after the interview, typed the Appellant's statement. Kuhar testified that it was a fair and accurate reduction of the substance of Appellant's interview. Additionally, Kuhar stated that he made the handwritten notes at the bottom of the page, which read, "The above statement was made verbally by John Ferguson in the presence of the following: Benny Strozier, Fred Cassell, Andy Kuhar, and Al Walcutt. When asked to sign this statement, John indicated that he would only if Al Walcutt would assure him that he would not prosecute."
 {¶ 24} After Kuhar's testimony, the court recessed. The next day, outside the presence of the jury, defense counsel requested a continuance because his client had failed to appear. Defense counsel informed the court that he advised Appellant to appear at 9:00 a.m. and that he attempted to contact Appellant to no avail. He further stated that Appellant's absence might damage his case. The court denied defense counsel's request for a continuance, noting an hour and half delay. The court further instructed the jury not to draw conclusions as to Appellant's guilt or innocence as a result of his absence. After the instructions, the trial proceeded with the testimony of Joseph Roth.
 {¶ 25} Roth testified that he was familiar with MPC's hiring practices. He explained that in many circumstances, MPC hired temporary agencies to recruit employees. These employees are given job assignments and an explanation of the company's policies. These employees worked for about six months and then possibly were hired onto the payroll. Although these employees do not receive a check from MPC directly, they are considered employees of MPC.
 {¶ 26} Roth further testified that on or about October 31, 2003, he was the employee who initially discovered the two boxes of nickel that had been removed from the plant and placed by a dumpster outside the plant. Soon after discovering the nickel, he found Appellant with a dolly about 120 to 200 feet from the location of the nickel. He requested that Appellant return the nickel to its proper place.
 {¶ 27} That same day, Roth was present at the meeting when Walcutt informed MPC employees that he was aware of the theft. Roth testified that Appellant was present during this meeting.
 {¶ 28} Additionally, on November 12, 2003, Roth recovered another set of pails containing nickel from the dumpster and returned them to the locked cage.
 {¶ 29} After Roth's testimony, the State rested its case, subject to the admissibility of the State's exhibits. Thereafter, Appellant moved for acquittal pursuant to Crim.R. 29. The trial court denied Appellant's motion and took a recess in order to afford Appellant more time to appear so that he could testify.
 {¶ 30} After the recess, the court discussed the Appellant's absence on the record, outside the presence of the jury. Defense counsel notified the court that Appellant had inadvertently "overslept" and was on his way to court. The court refused to continue the trial longer, noting Appellant's delay and the inconvenience caused to those involved in the proceedings. Accordingly, the defense rested its case without the testimony of Appellant.
 {¶ 31} Thereafter, the parties presented their closing statements and the court sent the jury to deliberate. During deliberations, the jury sent a note with a question to the judge. The judge answered the question, but did not read the question or response into the record.
 {¶ 32} On March 16, 2005, the jury found Appellant guilty of theft, but found the value of the property to be less than $500, a first-degree misdemeanor. The trial court sentenced the Appellant to a suspended six-month jail sentence, one year of probation, 60 days electronic home monitoring, and payment of restitution.
 {¶ 33} Appellant now appeals his conviction and submits four assignments of error for our review. In the interest of convenience, we will address the first assignment of error last.
 {¶ 34} Appellant's second assignment of error states:
 {¶ 35} "The state failed to present sufficient evidence to sustain Appellant's conviction."
 {¶ 36} When reviewing a challenge to the sufficiency of the evidence, an appellate court must view the evidence in a light most favorable to the prosecution and determine if any rational trier of fact could have found the essential elements of the crime, proven beyond a reasonable doubt. State v. Jenks (1991),61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph two of the syllabus, citing Jackson v. Virginia (1979), 443 U.S. 307,99 S.Ct. 2781, 61 L.Ed.2d 560. Thus, a reviewing court will not overturn a conviction for insufficiency of "the evidence unless we find that reasonable minds could not reach the conclusion reached by the trier of fact." State v. Treesh,90 Ohio St.3d 460, 484, 2001-Ohio-4, 739 N.E.2d 749.
 {¶ 37} The Appellant was charged and convicted of theft. R.C.2913.02 defines theft as follows:
 {¶ 38} "(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * *.
 {¶ 39} "(1) Without the consent of the owner or person authorized to give consent * * *."
 {¶ 40} Within this assignment of error, Appellant claims that the State presented no evidence or testimony that Appellant knew Hines was stealing nickel from MPC. On the contrary, we find sufficient evidence establishing Appellant's knowledge of the theft.
 {¶ 41} Andy Kuhar specifically testified that Appellant acknowledged he was aware that the two boxes of nickel in his vehicle were stolen. Even more compelling is the fact that Appellant was informed, nearly a week prior to driving Hines to the scrap yard, that Walcutt suspected someone was stealing nickel from the plant and that employees involved in the theft would be prosecuted. Walcutt and Roth both testified to the contents of this meeting, as well as Appellant's presence at the meeting. This evidence, coupled with the testimony of Walcutt, Kuhar, Cassell and Strozier that Appellant admitted to transporting Hines and two boxes from MPC to a scrap yard and receiving $40 for his assistance, sufficiently established the Appellant's knowledge of the theft. Accordingly, viewing the foregoing evidence in a light most favorable to the State, the jury reasonably inferred from the evidence that Appellant knew of the theft. Accordingly, as sufficient evidence existed to support Appellant's conviction, Appellant's second assignment of error is without merit.
 {¶ 42} Appellant's third assignment of error states:
 {¶ 43} "The Appellant's convictions are against the manifest weight of the evidence."
 {¶ 44} In State v. Thompkins, 78 Ohio St.3d 380, 388, 1997-Ohio-52, 678 N.E.2d 541, the court illuminated its test for manifest weight of the evidence as follows:
 {¶ 45} "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.' It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief. Black's [Law Dictionary (6 Ed. 1990)], at 1594."
 {¶ 46} When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Id., citing Tibbs v. Florida (1982), 457 U.S. 31,45, 102 S.Ct. 2211, 72 L.Ed.2d 652. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. See Statev. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. Furthermore, the discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. Id.
 {¶ 47} In this matter, we cannot conclude that the jury lost its way. As previously stated, Andy Kuhar testified that Appellant acknowledged his awareness that the nickel in the two boxes was stolen. Additionally, nearly a week prior to Appellant driving Hines to the scrap yard, Walcutt informed his employees, including Appellant, that he suspected an employee was stealing nickel, the circumstances leading up to this conclusion, and that if the theft continued, those involved would be prosecuted. Finally, Walcutt, Kuhar, Cassell and Strozier testified that Appellant admitted to transporting Hines to the scrap yard and receiving $40 for his assistance. In light of the foregoing, we cannot disagree with the jury's resolution finding Appellant guilty of theft. Accordingly, Appellant's third assignment of error is without merit.
 {¶ 48} Appellant's fourth assignment of error states:
 {¶ 49} "The Appellant's Due Process right to a fair jury trial under the United States Constitution and the Ohio Constitution was violated from the court's failure to respond to the jury's question on the record and in open court."
 {¶ 50} Within this assignment of error, Appellant maintains that the court's failure to respond to the jury question "on the record and in open court" violated his constitutional rights. Appellant further argues that he was denied his constitutional right to be present at a critical stage of his trial.
 {¶ 51} Pursuant to Crim.R. 52(B), plain errors or defects which affect substantial rights may be grounds for reversal even though they were not brought to the attention of the trial court. Notice of plain error, however, applies only under exceptional circumstances to prevent a manifest miscarriage of justice.State v. Long (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph three of the syllabus. Plain error does not exist unless it can be said that but for the error, the outcome of the trial would have clearly been otherwise. State v. Phillips,74 Ohio St.3d 72, 83, 1995-Ohio-171, 656 N.E.2d 643; State v.Moreland (1990), 50 Ohio St.3d 58, 62, 552 N.E.2d 894.
 {¶ 52} First, we find that Appellant's constitutional rights were not violated by his failure to be present during the receipt of and response to the jury question. Under theFourteenth Amendment, a defendant has a right to attend every critical stage of the trial. State v. Campbell, 90 Ohio St.3d 320, 346, 2000-Ohio-183, 738 N.E.2d 1178; State v. Richards, Cuyahoga App. No. 79350, 2002-Ohio-6623. When determining whether a stage of a trial is critical, the issue becomes "whether `his presence' has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." Campbell, supra.
 {¶ 53} This court in Richards, supra, was presented with the same issue of whether a defendant has a constitutional right to be present during the answering of a jury question. In theRichards case, the jury submitted three sets of questions to the trial court. While the prosecution and defense counsel participated in the discussions regarding the jury questions, the defendant was not present. In Richards, we found that Appellant's constitutional rights were not violated by his absence. In so holding, we relied on the Ohio Supreme Court's decision in State v. Campbell, supra, where the court stated:
 {¶ 54} "[The Defendant] had no right to be present at the legal discussion of how the [jury] question should be answered. Nor did he have a right to be present when the judge sent the [response] note to the jury room. Although the oral delivery of jury instructions in open court is a critical stage of trial, the trial court here did not instruct the jury in open court; instead, he sent a note. A defendant benefits from his presence, and may be harmed by his absence, when instructions are given in open court. * * * But these potential benefits and harms do not exist when the judge merely sends a note to the jury room. We therefore hold that the sending of the note was not a critical stage of the trial."
 {¶ 55} Richards, supra, quoting Campbell, supra at 346.
 {¶ 56} We similarly find in the instant matter that Appellant's Fourteenth Amendment rights were not violated. Here, as in Richards and Campbell, the trial court sent a note and did not instruct the jury in open court. Thus, the discussion regarding the jury question was not a critical stage of the trial and Appellant's constitutional rights were not violated.
 {¶ 57} Furthermore, we find that the court did not violate Appellant's rights by failing to respond to the jury's question "on the record and in open court." In Richards, we found that it is not necessary to announce "on the record" the responses to jury questions. In reaching our holding, we reasoned:
 {¶ 58} "The actual notes used to answer, along with the jury's written questions, are contained in the record submitted to this court and were available to [the defendant] for appellate purposes as well. He has demonstrated no prejudice, and this argument has no merit."
 {¶ 59} For the same reasons iterated above, we find that Appellant in this case failed to demonstrate any prejudice as a result of the trial court not responding to the jury question "on the record and in open court." Similar to the facts inRichards, here, the jury submitted a question to the judge, which the judge answered and returned without reading the question and answer into the proceedings. The record provided to this court, however, contains the actual jury note with the question and answer proscribed. Accordingly, as this note was available to Appellant and submitted to this court, Appellant suffered no prejudice. Appellant's fourth assignment of error is without merit.
 {¶ 60} Appellant's first assignment of error states:
 {¶ 61} "The Appellant was denied his effective assistance of counsel."
 {¶ 62} Within this assignment of error, Appellant maintains that trial counsel was ineffective for the following two reasons: (1) for failing to specifically move for a continuance for Appellant to attend court and to testify, and (2) for failing to request that the jury question be read into the record. We find that Appellant's arguments lack merit.
 {¶ 63} In order to demonstrate ineffective counsel, a defendant must show, not only that his counsel's representation was deficient, but also that the deficient performance prejudiced the defense. Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674; State v. Bradley (1989),42 Ohio St.3d 136, 538 N.E.2d 373. Counsel's performance may be found to be deficient if counsel "made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by theSixth Amendment." Strickland, supra, at 687. To establish prejudice, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." Bradley,
supra, at paragraph two of the syllabus; see, also, Strickland,
supra, at 687.
 {¶ 64} The Appellant has the burden of proving ineffective assistance of counsel and there is a strong presumption that a properly licensed trial counsel rendered adequate assistance.State v. Smith (1985), 17 Ohio St.3d 98, 100, 477 N.E.2d 1128. As the Strickland Court stated, a reviewing court "[m]ust indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland v. Washington, 466 U.S. at 689; see, also, State v. Hamblin (1988), 37 Ohio St.3d 153,524 N.E.2d 476. Appellant first asserts that trial counsel's performance was deficient in that defense counsel failed to specifically move for a continuance when Appellant failed to attend the trial and testify. We find that defense counsel did request a continuance. A reading of the transcript of the proceedings reveals that defense counsel stated:
 {¶ 65} "I have tried calling him on the cell phone but there's no answer and I would request that the Court might continue the case. I know we have a jury ready, waiting to come in. However, it may be damaging to my client for them to see that he is not present."
 {¶ 66} While we acknowledge that defense counsel did not state that he "moves" for a continuance, we find his request sufficient. The trial court did not deny defense counsel's request for failing to properly move for a continuance. Instead, the court denied defense counsel's request because the court waited one and a half hours for the Appellant, the trial had begun the day before, defense counsel had made attempts to contact Appellant, both the court and counsel had informed Appellant of the time trial was to resume, and the jury was waiting for trial to reconvene. Accordingly, we find that defense counsel did, in fact, move for a continuance.
 {¶ 67} Moreover, had we determined that defense counsel did not adequately move for a continuance, we nevertheless would find that counsel's failure to do so did not prejudice Appellant. Any prejudice to the Appellant was not the result of counsel's alleged deficiencies, but instead was Appellant's own doing. Appellant failed to appear despite being notified by the court and his counsel of the time that trial would resume. As stated previously, defense counsel telephoned Appellant numerous times seeking to locate Appellant. Appellant cannot place blame on counsel, when in fact, Appellant was solely responsible for his absence and failure to testify.
 {¶ 68} Additionally, we also note that the trial court instructed the jury not to draw any conclusions as to guilt or innocence due to Appellant's absence at the proceedings. The court reiterated that the State must prove its case with the evidence beyond a reasonable doubt. In light of this instruction, we cannot conclude that Appellant was prejudiced and any alleged error was indeed harmless. Accordingly, Appellant has failed to establish that defense counsel's representation was deficient and that the result is unreliable. Therefore, Appellant's first assignment of error is without merit.
 {¶ 69} Additionally, within this assignment of error, Appellant argues that his counsel was deficient because he failed to request that the jury question be read into the record. As stated previously, in order to prove ineffective assistance of counsel, a defendant must establish that there is a reasonable probability that, but for counsel's deficiency, the outcome of the trial would have been otherwise. State v. Bradley, supra, at paragraph two of syllabus; Strickland v. Washington, supra at 687. As we determined in Appellant's fourth assignment of error that he did not suffer any prejudice or harm as a result of the jury question not being read into the record, Appellant's claim for ineffective assistance of counsel must likewise fail because he is unable to demonstrate that the result of the trial would have been different had counsel requested that the jury question be read into the record. Accordingly, Appellant's first assignment of error is without merit.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal. It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Sweeney, J., and Cooney, J., concur.