[Cite as *State v. Blevins*, 2019-Ohio-2744.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
PICKAWAY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | |
| Plaintiff-Appellee, | : | Case No. 18CA2 |
| | : | |
| vs. | : | |
| | : | <u>DECISION AND</u> |
| | : | <u>JUDGMENT ENTRY</u> |
| JUSTIN RAY BLEVINS, | : | |
| | : | |
| Defendant-Appellant. | : | |

_____

APPEARANCES:

Dennis C. Belli, Columbus, Ohio, for Appellant.

Judy C. Wolford, Pickaway County Prosecutor, and Heather MJ Carter, Assistant Pickaway County Prosecutor, Circleville, Ohio, for Appellee.

_____

Smith, P.J.

{¶1} Appellant, Justin Ray Blevins, appeals his convictions and sentences for aggravated murder, murder, and felonious assault. On appeal, Appellant contends that 1) his conviction for aggravated murder is not supported by sufficient evidence of prior calculation and design; 2) a defective voluntary manslaughter instruction rose to the level of plain error and deprived him of his constitutional right to a jury determination of his guilt of a less serious offense than the aggravated murder and murder counts of the indictment; 3) his exclusion from the proceedings involving responses

to the jury's questions violated his Crim.R. 43 and constitutional rights to be present for all critical stages of the proceedings; 4) the trial court's incorrect, incomplete, and confusing responses to the jury's questions amounted to an abuse of discretion and deprived him of his right to a fundamentally fair trial and reliable jury verdict; 5) he was denied his right to the effective assistance of counsel due to the combined prejudicial impact of multiple instances of deficient performance; 6) the jury's verdicts of guilty for aggravated murder, murder and felonious assault are against the manifest weight of the evidence; and 7) the record clearly and convincingly does not support the imposition of a life prison term with parole eligibility after serving thirty years.

{¶2} Because we conclude Appellant's conviction for aggravated murder was supported by sufficient evidence of prior calculation and design, we find no merit to Appellant's first assignment of error and it is overruled. In light of our conclusion that Appellant was not entitled to a jury instruction on voluntary manslaughter, he cannot demonstrate that he was prejudiced by the trial court's alleged error. Thus, we find no merit to Appellant's second assignment of error and it is also overruled. Likewise, because we find that that the trial court's provision of written answers to the jury in response to the jury's written questions did not constitute a critical stage of the

proceedings, Appellant's statutory and constitutional rights to be present were not violated. As such, Appellant's third assignment of error is also overruled.

{¶3} With regard to Appellant's fourth assignment of error, because the jury's first question dealt with the voluntary manslaughter instruction and because we have found Appellant was not entitled to that instruction, any error by the court in answering the question was harmless. Further, as we find no error in the answer provided by the trial court in response to the jury's second question, we find no merit to Appellant's fourth assignment of error and it is likewise overruled. Additionally, in light of our conclusion that trial counsel did not provide ineffective assistance and that Appellant failed to show cumulative error affected the outcome of the proceedings, Appellant's fifth assignment of error is overruled. Likewise, Appellant's sixth assignment of error is overruled because we have found his convictions were not against the manifest weight of the evidence. Finally, because Appellant's sentence is supported by the record and is not clearly and convincingly contrary to law, Appellant's seventh assignment of error has no merit and is also overruled.

{¶4} Having found no merit in any of the assignments of error raised by Appellant, the judgment of the trial court is affirmed.

FACTS

{¶5} Appellant, Justin Ray Blevins, was indicted on July 7, 2017, on four felony counts which included: 1) aggravated murder in violation of R.C. 2903.01(A); 2) murder in violation of R.C. 2903.02(A); 3) murder in violation of R.C. 2903.02(B); and felonious assault in violation of R.C. 2903.11(A)(2). Counts one through three were unspecified felonies and count four was a second-degree felony. Additionally, counts one through four all contained firearm specifications which specified the use of a .40 caliber handgun. The indictment stemmed from an investigation relating to the death of the Samuel Nicholson, the victim herein, a sixteen-year-old male residing in an apartment rented by Darrell Arnett.

{¶6} The investigation into Nicholson's death began with a 911 call at approximately 5:30 a.m. on the morning of June 11, 2017, from Arnett's sister, who lived in the same apartment complex as Arnett and Nicholson. The call initially reported a burglary and a fight. When law enforcement arrived at the scene they found Arnett waiting outside and subsequently found the victim inside the apartment, deceased, from what appeared to be multiple gunshot wounds. Once the scene was secured and evidence gathered, Arnett was taken to the police station for questioning where he was cooperative and voluntarily gave a statement.

{¶7} Arnett reported that he had known the victim since they were children and that he had allowed the victim to live with him because he had nowhere else to stay. He reported he went to bed the night before and the apartment was empty with the exception of the victim. He stated he awoke in the early morning to the sound of gunshots and then heard the victim yell "What the fuck?" He then heard additional gunshots. He reported he got up, grabbed his hatchet and ran downstairs where he saw the victim lying in the floor. He stated he caught a glimpse of someone exiting the apartment wearing red shorts and a red shirt. He reported that he kicked the victim and told him to get up but he didn't respond. He reported that the assailant returned to the apartment and an altercation ensued. He reported that he scratched the assailant and that the assailant placed him in a headlock. He explained that when he was finally able to free himself, he ran out of the apartment to his sister's apartment and asked her to call for help. Arnett advised law enforcement he believed the assailant was Appellant, Justin Blevins. DNA samples were taken from underneath Arnett's fingernails which ultimately matched Appellant's DNA. Arnett's statements along with law enforcement's subsequent investigation led to Appellant's arrest and subsequent indictment.

{¶8} The matter proceeded to a jury a trial on December 11, 2017. The State introduced several witnesses, including: 1) Darrell Arnett, the victim's roommate; 2) Sergeant James Zimmerman, who first arrived at the scene and confirmed the victim was deceased; 3) Dr. John Ellis, the county coroner; 4) Special Agent Todd Fortner, who took photographs and helped process the evidence; 5) Logan Schepeler, a forensic scientist in the DNA section of the Bureau of Criminal Investigation (hereinafter "BCI") who confirmed the Appellant's DNA matched the sample taken from under Arnett's fingernails; 6) Andrew McClelland, a forensic scientist and firearms examiner with BCI, who examined the gun recovered from the scene, along with the spent and unspent bullets and cartridge cases recovered as a result of the investigation; 7) Lieutenant Detective Jeffrey George, the lead detective on the case from the Ashville Police Department; 8) Chloe Brady, a mutual friend of the victim and Appellant; 9) Dwight Haddox, the boyfriend of Appellant's mother, who had contact with Appellant in the days following the murder; and 10) Detective Phil Roar, who conducted a search of the cell phones pertinent to the investigation.  Appellant introduced five witnesses, and also testified on his own behalf.

{¶9} Pertinent to this appeal, Darrell Arnett testified at trial that he was able to identify Appellant by his voice because he had viewed several

videos Appellant had placed on the internet. He also testified he had seen Appellant on prior occasions. Sergeant James Zimmerman testified that when he responded to the scene he found the apartment in a disheveled state with furniture knocked over. He also testified he found a hatchet and a semi-automatic pistol near the couch. Dr. John Ellis, the county coroner, testified that the apartment was a mess when he observed it. He testified that when he encountered the victim, it appeared he had been rolled over by someone. Dr. Ellis testified that the victim sustained three bullet wounds to his head, three bullet wounds to his torso, four bullet wounds to his upper left extremities, and four bullet wounds to his upper right extremities. Dr. Ellis went over each entrance and exit wound and testified that he suspected some of the bullets created more than one entrance and exit wound. He testified that in his opinion ten or eleven shots were fired. Importantly, Dr. Ellis testified that several of the shots entered posteriorly and exited anteriorly, which indicates the victim was shot from behind. Dr. Ellis also testified that the trajectory of a shot that entered the victim's jaw and exited his chin was in a downward motion, rather than an upward motion, as testified to later by Appellant. Further, Dr. Ellis testified that the shots to the victim's upper extremities suggested "defensive wounds" from where the victim was likely holding his arms up to defend himself. Dr. Ellis testified

that one of the shots to the victim's head had a gunpowder burn, suggesting it was a contact wound.  Lastly, Dr. Ellis testified that the victim died from multiple gunshot wounds.

{¶10} Special Agent Todd Fortner testified that the condition of the apartment showed obvious signs of a struggle.  He testified that he recovered the murder weapon, which was a Daewoo .40 caliber Smith and Wesson (hereinafter "S&W") semi-automatic pistol, which is rare.[1]  He testified that he found the gun with an empty magazine seated in it, with the slide locked and pulled back, as you would find when a gun is completely expended.  He testified it was easy to conclude that whoever had the gun emptied it.  He further testified that he recovered several spent bullets and cartridge cases. He explained that all of the cartridge cases were on one side of the room and all of the fired bullets were found on the opposite side of the room where the victim was located.  He testified he found bullets in the wall, baseboard, carpet and in a game controller, indicating all the shots that were fired were fired in the direction of the victim.  He also testified that he subsequently executed a search warrant of Bret Taylor's vehicle, which was determined to the be the vehicle Appellant drove that night, and that he recovered an

---

[1] "Smith & Wesson (S&W) is an American manufacturer of firearms, ammunition and restraints." https://en.wikipedia.org/wiki/Smith_%26_Wesson

unspent bullet, or cartridge case, with a .40 S&W with a headstamp N.F.C.R. on it, which matched the other cartridge cases found at the scene.

{¶11} Andrew McClelland testified regarding his forensic examination of the murder weapon. He confirmed the gun recovered was a Daewoo model DH40 .40 caliber S&W semi-automatic pistol bearing serial number DA100522 with one magazine. He testified that the gun had a capacity of ten cartridges and was able to hold one bullet before firing, explaining that "it can hold what's referred to as ten plus one, meaning one in the chamber of the firearm plus ten additional cartridges in the magazine." He further testified that as part of examination he was able to conclude that the firearm was discharged and that the eight recovered, fired .40 caliber S&W cartridges were identified as having been fired from that firearm. He also testified that the unspent bullet, or unfired cartridge, that was recovered had been cycled through the submitted magazine and bore the same markings as the fired cartridges.

{¶12} Lieutenant Detective Jeffery George also testified as part of the State's case. He served as the lead detective and interviewed multiple individuals identified as friends or acquaintances of Appellant and the victim, who had been with or spoken with Appellant or the victim just before the murder. Some of these individuals included Chloe Brady, Bryce

Sparks, Autumn Leach, Halee Hilton and Dwight Haddox. He testified that he learned during his investigation that Chloe Brady, Halee Hilton and Autumn Leach had all seen a Facebook message sent from Appellant the day prior to the murder, which included a photo of the gun used in the murder along with the comment "I gotta go take care of some b.s." The message was sent by Appellant through Facebook messenger to Halee Hilton, and also possibly Autumn Leach. Chloe Brady testified as well, regarding the photo sent to Hilton from Appellant.

{¶13} Dwight Haddox testified that he was called to go pick up Appellant in Londonderry the day after the murder. He testified that while in the car with Appellant, as well as Appellant's sister and mother, Appellant made a loud outburst, almost a cry, and stated he had killed Sammy. He stated Appellant and his sister were in the car with him the next day as well and that he heard a comment made about the gun being emptied. He testified that at that point he figured Appellant was on the run and that he dropped Appellant off on the side of the road and subsequently went to the Sheriff's station to make a report.

{¶14} Finally, Detective Phil Roar testified for the State. He testified that he examined cell phones and phone records as part of the investigation. He testified to a series of text messages between Appellant and the victim

leading up to the day of the murder which suggested a disagreement was beginning to develop over drug transactions and money owed to the victim. He recited several threatening messages between the two, indicating the victim told Appellant he was "strapped" and that both of them may lose their lives over $700.00.  The last text communication between the two took place around 11:00 p.m. the night before the murder.

{¶15} Appellant testified on his own behalf at trial.  He did not deny going to the victim's house with a loaded gun, nor did he deny shooting the victim to death.  Although he suggested Darrell Arnett may have been the one to empty the gun and ultimately kill the victim, there was absolutely no evidence introduced to support this theory.  Further, Appellant's main theory at trial seemed to be that he was justified in killing the victim, either based upon a theory of provocation or self-defense.  Appellant testified that he owed the victim $700.00 for marijuana that the victim had fronted him and that the victim had been threatening to kill him if he didn't pay.  He admitted to sending the message with the photo of the gun but stated it was in reference to a dispute with another person.  He testified that he borrowed Bret Taylor's car and drove it to the victim's apartment at 5:10 in the morning on June 11, 2017, knocked on the door and entered with permission of the victim.  He stated he advised he had the $700.00 but that the victim

began arguing with him.  He stated they began cussing at one another and that the victim pushed him down to the ground.  Appellant testified that his gun fell out of his pants when he was shoved to the ground.  He testified that the victim began to reach for a gun so he grabbed his own gun and began shooting the victim from his position on the floor in an upward direction. He testified he didn't know if the victim's gun was loaded, but that he fired three or four shots.  He testified that he ran out of the apartment, vomited and then returned to the apartment because he realized he left his gun.  When he returned, he encountered Darrell Arnett with a hatchet and fought with him.  He testified he got away from Arnett and ran out of the apartment, leaving Arnett there.

{¶16} The matter was eventually submitted to the jury for deliberations after the trial court instructed the jury on the indicted offenses, as well as voluntary manslaughter, without objection by the State.  The jury submitted two questions in writing to the trial court during their deliberations, which were answered in writing by the trial court.  These questions will be discussed further below.  The jury ultimately returned verdicts finding Appellant guilty of all the counts contained in the indictment.  The trial court merged counts two through four for purposes of sentencing and sentenced Appellant to life in prison with eligibility for

parole after thirty years for the aggravated murder of Samuel Nicholson.

Appellant now brings his timely appeal, setting forth the following

assignments of error for our review.

## ASSIGNMENTS OF ERROR

I.     "DEFENDANT-APPELLANT'S CONVICTION FOR AGGRAVATED MURDER IS NOT SUPPORTED BY SUFFICIENT EVIDENCE OF 'PRIOR CALCULATION AND DESIGN' TO SATISFY THE REQUIREMENTS OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION."

II.    "A DEFECTIVE VOLUNTARY MANSLAUGHTER INSTRUCTION ROSE TO THE LEVEL OF PLAIN ERROR AND DEPRIVED DEFENDANT-APPELLANT OF HIS RIGHT, UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, TO A JURY DETERMINATION OF HIS GUILT OF A LESS SERIOUS OFFENSE THAN THE AGGRAVATED MURDER AND MURDER COUNTS OF THE INDICTMENT."

III.   "THE EXCLUSION OF DEFENDANT-APPELLANT FROM THE PROCEEDINGS INVOLVING RESPONSES TO THE JURY'S QUESTIONS VIOLATED CRIM. R. 43 AND DEPRIVED HIM OF HIS RIGHT TO BE PRESENT FOR ALL CRITICAL PROCEEDINGS PURSUANT TO THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION."

IV.   "THE TRIAL COURT'S INCORRECT, INCOMPLETE, AND CONFUSING RESPONSES TO THE JURY'S QUESTIONS AMOUNTED TO AN ABUSE OF DISCRETION AND DEPRIVED DEFENDANT-APPELLANT OF HIS RIGHT TO A FUNDAMENTALLY FAIR TRIAL AND RELIABLE JURY VERDICT UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION."

V.      "DEFENDANT-APPELLANT WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL, AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, DUE TO THE COMBINED PREJUDICIAL IMPACT OF MULTIPLE INSTANCES OF DEFICIENT PERFORMANCE."

VI.     "THE JURY'S VERDICTS OF GUILTY FOR AGGRAVATED MURDER, MURDER AND FELONIOUS ASSAULT ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

VII.    "THE RECORD CLEARLY AND CONVINCINGLY DOES NOT SUPPORT THE IMPOSITION OF A LIFE PRISON TERM WITH PAROLE ELIGIBILITY AFTER SERVING 30 YEARS."

ASSIGNMENT OF ERROR I

{¶17} In his first assignment of error, Appellant contends his conviction for aggravated murder is not supported by sufficient evidence of "prior calculation and design" to satisfy the requirements of the due process clause of the Fourteenth Amendment to the United States Constitution. Appellant argues that the fact he armed himself with a gun for his own protection because he anticipated a possibility of violence does not equate to "a scheme designed to implement a calculated decision to kill[,]" and that the State failed to prove beyond a reasonable doubt this element of aggravated murder.  The State contends the jury verdict, including the finding of prior calculation and design, was supported by the testimony introduced at trial.

{¶18} A claim of insufficient evidence invokes a due process concern and raises the question whether the evidence is legally sufficient to support the verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). When reviewing the sufficiency of the evidence, an appellate court's inquiry focuses primarily upon the adequacy of the evidence; that is, whether the evidence, if believed, reasonably could support a finding of guilt beyond a reasonable doubt. *Thompkins*, syllabus. The standard of review is whether, after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *E.g., Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781 (1979); *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991). Furthermore, a reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *Thompkins* at 390.

{¶19} Thus, when reviewing a sufficiency of the evidence claim, an appellate court must construe the evidence in a light most favorable to the prosecution. *E.g., State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); *State v. Grant*, 67 Ohio St.3d 465, 477, 620 N.E.2d 50 (1993). A

reviewing court will not overturn a conviction on a sufficiency of the evidence claim unless reasonable minds could not reach the conclusion that the trier of fact did. *State v. Tibbetts*, 92 Ohio St.3d 146, 162, 749 N.E.2d 226 (2001); *State v. Treesh*, 90 Ohio St.3d 460, 484, 739 N.E.2d 749 (2001). Here, after our review of the record, we believe the State presented sufficient evidence to support the finding of prior calculation and design.

{¶20} The jury convicted Appellant of aggravated murder in violation of R.C. 2923.01(A), which provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * *." Appellant does not contest, under this assignment of error, that the State established that he purposely caused the death of the victim, Sammy Nicholson. Instead, he limits his argument to a claim that the State did not introduce sufficient evidence that he acted with prior calculation and design.

{¶21} "The phrase 'prior calculation and design' by its own terms suggests advance reasoning to formulate the purpose to kill. Evidence of an act committed on the spur of the moment or after momentary consideration is not evidence of a premeditated decision or a studied consideration of the method and the means to cause a death." *State v. Walker*, 150 Ohio St.3rd 409, 2016-Ohio-8295, 82 N.E.2d 1124, ¶18; *see also State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶151. As this Court

recently observed in State v. Phillips, 4th Dist. Scioto No. 18CA3832, 2018-Ohio-5432, at ¶28, "[t]here are three factors courts generally consider to determine whether a defendant acted with prior calculation and design: (1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or an almost instantaneous eruption of events? *Walker* at ¶20. Although these factors provide guidelines, there is no bright-line test for prior calculation and design, and each case instead turns upon the particular evidence introduced at trial. *Walker* at ¶19; *State v. McWay*, 3d Dist. Allen No. 1-17-42, 2018-Ohio-3618, ¶16.

{¶22} Here, regarding the first factor, the State presented evidence that established Appellant and the victim knew one another and had a "business relationship" to the extent they cooperated with one another in the illegal sale of drugs. Further, the State introduced evidence indicating their relationship had recently become strained because Appellant owed the victim $700.00 for drugs that were "fronted" to him to sell.

{¶23} Regarding the second factor, the State introduced evidence in the form of a text message that included a photo of Appellant's gun (the gun used in the murder), along with a comment stating Appellant needed to go

"take care of some b.s."  The evidence introduced at trial indicated Appellant sent this message from his phone to more than one individual the evening prior to the murder.  The record further reveals that Appellant borrowed a vehicle to drive to the victim's residence at 5:00 in the morning, allegedly to pay him the money that was owed.  However, instead of leaving the money in a grill outside the victim's apartment, as had been customary in the past, Appellant went into the victim's apartment with a loaded gun on his person.  Additional evidence indicated an unspent bullet, of the same type used in the murder, was found in the vehicle Appellant drove, which supports an inference that he loaded the gun just prior to either driving to, or entering, the victim's residence.

{¶24} Finally, with respect to the final factor which considers the duration of the events at issue, the State argued Appellant went to the victim's residence with a mission and that he walked in and shot the victim without a struggle.  As such, the State argued the incident was an "instantaneous eruption of events" which, in the State's view, mitigated in favor of a finding of prior calculation and design.  Appellant argued that there was a struggle and that he shot the victim in self-defense after the victim shoved him to the ground.  Appellant further argues that the State's theory that the murder occurred as part of an "instantaneous eruption of

events" mitigates against, rather than in favor of, a finding of prior calculation and design.

{¶25} In truth, it cannot be discerned from the record whether this incident was a drawn-out struggle, or whether it was an instantaneous eruption of events. The crime scene certainly indicated a struggle had taken place, but that could have been a result of the struggle between Appellant and Darrell Arnett (the victim's roommate) after the victim was murdered. In any event the first two factors indicate Appellant planned to murder the victim, rather than simply go to his apartment in the middle of the night to pay him the money that was owed. As set forth above, the factors are only guidelines and there is no bright-line test. Based upon the evidence before it, we believe the jury could justifiably conclude that Appellant was determined to complete a specific course of action. Thus, the jury's aggravated murder conviction, including their finding of prior calculation and design, was supported by sufficient evidence. Accordingly, Appellant's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

{¶26} In his second assignment of error, Appellant contends the trial court provided the jury with a defective voluntary manslaughter instruction

that rose to the level of plain error and deprived him of his rights under the Sixth and Fourteenth Amendments to the United States Constitution to a jury determination of his guilt of a less serious offense than the aggravated murder and murder counts of the indictment. The State concedes the voluntary manslaughter instructions were erroneous to the extent the instructions treated voluntary manslaughter as a lesser included offense, rather than an inferior degree offense. However, the State argues the error was harmless, reasoning that Appellant was arguably not entitled to the provision of a voluntary manslaughter instruction based upon the absence of evidence Appellant acted as a result of a sudden fit of rage or passion.

{¶27} Generally, our review of "whether jury instructions correctly state the law is *de novo*." *State v. Kulchar*, 4th Dist. Athens No. 10CA6, 2015–Ohio–3703, ¶15; citing *State v. Brown*, 4th Dist. Athens No. 09CA3, 2009-Ohio-5390, ¶34. "[R]eversible error should not be predicated upon one phrase or one sentence in a jury charge; instead, a reviewing court must consider the jury charge in its entirety." *Id.*; citing *State v. Porter*, 14 Ohio St.2d 10, 13, 235 N.E.2d 520 (1968). "[I]f an instruction correctly states the law, its precise wording and format are within the trial court's discretion." *Kulchar* at ¶15.

{¶28} However, implicit in Appellant's argument is the fact that he failed to object to the voluntary manslaughter instruction given by the trial court.  Thus, he has waived all but plain error.  "'To constitute plain error, a reviewing court must find (1) an error in the proceedings, (2) the error must be a plain, obvious or clear defect in the trial proceedings, and (3) the error must have affected "substantial rights" (i.e., the trial court's error must have affected the trial's outcome).'" *State v. Blanton*, 4th Dist. Adams No. 16CA1031, 2018-Ohio-1275, ¶85; quoting *State v. Dickess*, 174 Ohio App.3d 658, 2008–Ohio–39, 884 N.E.2d 92, ¶31 (4th Dist.); citing *State v. Hill*, 92 Ohio St.3d 191, 749 N.E.2d 274 (2001), and *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002–Ohio–68, 759 N.E.2d 1240.

{¶29} "'Furthermore, notice of plain error must be taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice.'" *Blanton* at ¶85; citing *State v. Landrum*, 53 Ohio St.3d 107, 111, 559 N.E.2d 710 (1990), and *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.  "A reviewing court should notice plain error only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id*.  "'A defective jury instruction does not rise to the level of plain error unless the defendant shows that the outcome of the trial clearly would have been

different but for the alleged erroneous instruction.'" *Blanton* at ¶87; quoting

*Dickess* at ¶32; citing *State v. Campbell*, 69 Ohio St.3d 38, 41, 630 N.E.2d

339 (1994), and *Cleveland v. Buckley*, 67 Ohio App.3d 799, 805, 588 N.E.2d

912 (8th Dist.1990).

{¶29} Appellant argues the jury instructions provided by the trial

court improperly foreclosed the jurors from considering voluntary

manslaughter in the event they found that the prosecution had proven the

elements of aggravated murder and murder. Appellant further argues that

the defective instructions deprived him of his constitutional right to a jury

finding as to the presence of sudden passion or sudden fit of rage, as a

circumstance mitigating aggravated murder and murder to voluntary

manslaughter. Appellant argues the trial court further confused the jury by

providing a lesser included offense instruction, when voluntary

manslaughter is, instead, an inferior degree offense of aggravated murder

and murder.

{¶30} The trial court instructed the jury as follows:

"If the defendant failed to establish the defense of voluntary

manslaughter, the State still must prove to you beyond a

reasonable doubt that the defendant knowingly caused the death

of Samuel Nicholson, II.

\* \* \*

If you find that the State proved beyond a reasonable doubt all the essential elements of any one or more of the offenses charged in the separate counts in the indictment, your verdict must be guilty as to such offense or offenses according to your finding.  If you find that the State failed to prove beyond a reasonable doubt any one of the essential elements of any one or more of the offenses charged in the separate counts of the indictment, your verdict must be not guilty as to such offense or offenses according to your findings.  You will then continue your deliberations to decide whether the State has proved beyond a reasonable doubt all the essential elements of the inferior degree offense of voluntary manslaughter.  If all of you are unable to agree on a verdict of either guilty or not guilty of any or all of the charged offenses, then you will continue your deliberations to decide whether the State has proved beyond a reasonable doubt all the essential elements of the inferior degree offense of voluntary manslaughter.  If the evidence warrants it, you may find the defendant guilty of an offense lesser than that charged in the indictment; however,

notwithstanding this right, it is your duty to accept the law as

given to you by the court, and if the facts and law warrant a

conviction of the offense charged in the indictment, then it is

your duty to make such a finding uninfluenced by your power

to find a lesser offense.

* * *

Next page is the inferior degree of voluntary manslaughter.

This charge shall only be considered if either of the following

apply:

One:  The defendant has been found not guilty of aggravated

murder, murder, and felony murder;

Or Two:  You are unable to reach a verdict with respect to

aggravated murder, murder, and felony murder.

Thus, the trial court instructed the jury that voluntary manslaughter was (1)

an inferior degree offense; (2) a lesser included offense; and (3) also a

defense.  It further instructed the jury that the burden of proving the

elements of voluntary manslaughter was upon the State, rather than the

defendant, and that it must be proven by proof beyond a reasonable doubt,

rather than by a preponderance of the evidence.

{¶31} As this Court noted in *State v. Goff*, 4th Dist. Lawrence No. 11CA20, 2013-Ohio-42, ¶46, "'[v]oluntary manslaughter is an inferior degree of murder." Quoting *State v. Alexander*, 4th Dist. Scioto No. 08CA3221, 2009-Ohio-1401, ¶62; *accord State v. Shane*, 63 Ohio St.3d 630, 632, 590 N.E.2d 272 (1992); *see also State v. Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294, paragraphs two and three of the syllabus.[2] As further set forth in *Goff* at ¶46:

> "A defendant on trial for murder or aggravated murder bears the
> burden of persuading the fact finder, by a preponderance of the
> evidence, that he or she acted under the influence of sudden
> passion or in a sudden fit of rage, either of which was brought
> on by serious provocation occasioned by the victim that was
> reasonably sufficient to incite the defendant into using deadly
> force, R.C. 2903.03(A), in order for the defendant to be
> convicted of voluntary manslaughter rather than murder or

---

[2] According to *State v. Deem*, "[a]n offense is an 'inferior degree' of the indicted offense where its elements are identical to or contained within the indicted offense, except for one or more additional mitigating elements." *Deem* at paragraph two of the syllabus. *Deem* further explains that "[a]n offense may be a lesser included offense of another if (i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense." *Deem* at paragraph three of the syllabus; citing *State v. Kidder*, 32 Ohio St.3d 279, 513 N.E.2d 311 (1987), modified.

aggravated murder.  *State v. Rhodes*, 63 Ohio St.3d 613, 590

N.E.2d 261 (1992), syllabus."

Additionally, as explained in *Goff* at ¶47, "when a voluntary manslaughter

instruction is appropriate, a trial court should instruct the jury 'to consider

the mitigating evidence to determine whether [the defendant] proved

voluntary manslaughter.'"  Citing *State v. Benge*, 75 Ohio St.3d 136, 140–

141, 661 N.E.2d 1019 (1996).

{¶32} As set forth above, the State conceded the jury instructions

were erroneous to a certain extent.  Thus, we will assume the trial court's

instructions, as they pertained to the consideration of voluntary

manslaughter as an inferior degree offense, were defective and prevented the

jury from considering the voluntary manslaughter charge.  However, as

observed in *Goff*, "in order for there to be reversible error, there must be

prejudice to the appellant."  *Goff* at ¶48 (internal citations omitted).  In the

case sub judice, as was the situation in *Goff*, Appellant cannot demonstrate

prejudice because the evidence introduced at trial did not warrant a

voluntary manslaughter instruction.

{¶33} In order for a voluntary manslaughter instruction to be given,

there is a requirement of both objective and subjective evidence.  *Goff* at

¶50.  Appellant first had to show "evidence of reasonably sufficient

provocation occasioned by the victim * * * to warrant such an instruction. *Id.*; quoting *Shane* at 630. This determination is to be made using an objective standard. *Goff* at ¶50. For example, we have explained that "'[f]or provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control.'" *Id.*; quoting *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶81; in turn quoting *Shane* at 635. If the objective component is satisfied, the inquiry then "shifts to the subjective component, which considers whether this particular actor, in this particular case, was actually under the influence of sudden passion, or was in a sudden fit of rage. *Goff* at ¶51; citing *Shane* at 634.

{¶34} We explained analysis of the subjective component in *Goff* as follows:

"When analyzing the subjective component, 'evidence

supporting the privilege of self-defense, i.e., that the defendant

feared for [her] own and [others'] personal safety, does not

constitute sudden passion or a fit of rage as contemplated by the

voluntary manslaughter statute.' *State v. Harris*, 129 Ohio

App.3d 527, 535, 718 N.E.2d 488 (10th Dist.1998). 'While

self-defense requires a showing of fear, voluntary manslaughter

requires a showing of rage, with emotions of "anger, hatred, jealously, and/or furious resentment."' *State v. Levett*, 1st Dist. No. C–040537, 2006–Ohio–2222, ¶29, quoting *State v. Perdue*, 153 Ohio App.3d 213, 2003–Ohio–3481, 792 N.E.2d 747, ¶12 (7th Dist.), in turn quoting *Harris* at 535; *accord State v. Sudderth*, 4th Dist. No. 07CA38, 2008–Ohio–5115, ¶14; *see also* [*State v.Hendrickson*, 4th Dist. Athens No. 08CA12, 2009– Ohio–4416, ¶45–46]; *State v. Caldwell*, 10th Dist. No. 98AP– 165, 1998 WL 890232, *7 (Dec. 17, 1998)." *Goff* at ¶52.

{¶35} Assuming arguendo the objective component was met, the record before us reveals that Appellant introduced no subjective evidence that he killed the victim while he was under the influence of sudden passion or in a sudden fit of rage. Therefore, Appellant cannot demonstrate that he was prejudiced if the trial court's jury instructions did, in fact, prevent the jury from considering the voluntary manslaughter instruction. As set forth above, Appellant argued theories of voluntary manslaughter, as a result of provocation. He also raised the affirmative defense of self-defense. In his trial testimony, Appellant alleged he was frightened by threats made by the victim towards him in the days leading up to the incident. He also testified that in shooting the victim, he acted out of fear because he was afraid if he

didn't shoot, the victim would shoot him first. There is no evidence, after a thorough review of Appellant's trial testimony, that he was actually under the influence of sudden passion or in a sudden fit of rage when he shot the victim. Thus, there was insufficient evidence introduced at trial to warrant a voluntary manslaughter instruction. As such, assuming the manner in which the trial court instructed the jury prevented the jury from considering the voluntary manslaughter charge, Appellant cannot demonstrate he was prejudiced by the alleged error. Accordingly, we find no merit to Appellant's second assignment of error and it is overruled.

## ASSIGNMENT OF ERROR III

{¶36} In his third assignment of error, Appellant contends that his exclusion from the proceedings involving responses to the jury's questions violated Crim.R. 43, which governs the presence of defendants at every stage of the criminal proceedings and at trial, with certain exceptions. He also contends he was deprived of his constitutional right to be present for all critical stages of the proceedings. "An accused has a fundamental right to be present at all critical stages of his criminal trial." *State v. Hale*, 119 Ohio St.3d 118, 2008–Ohio–3426, 892 N.E.2d 864, ¶100. "An accused's absence, however, does not necessarily result in prejudicial or constitutional error." *State v. Davis*, 116 Ohio St.3d 404, 2008–Ohio–2, 880 N.E.2d 31, ¶90.

"'[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, *and to that extent only*.'" *Hale* at ¶100; quoting *Snyder v. Massachusetts*, 291 U.S. 97, 107–108, 54 S.Ct. 330 (1934), overruled on other grounds by *Malloy v. Hogan*, 378 U.S. 1, 17, 84 S.Ct. 1489, (1964). The question is whether his presence has a "reasonably substantial" relationship to "the fullness of his opportunity to defend against the charge." *Id.*; quoting *Snyder* at 105–106.

{¶37} In his brief, Appellant appears to contend that neither he, nor his counsel were present when the trial court considered and responded in writing to written questions submitted by the jury during their deliberations. For instance, Appellant argues that Volume 4 of the trial transcript indicates there were no proceedings held in open court in which he was present during the time in between the jury being released for deliberations and the announcement of the verdict nearly five hours later. A review of the transcript indicates no proceedings were held in open court during that time. However, the State represents that the written questions submitted by the jury were reviewed by the court and counsel, and then "returned to the jury following an agreed upon answer by all parties." Further, our review of the record indicates Appellant's trial counsel filed a post-trial motion for a new

trial in which he referenced the fact that he was surprised by a statement contained in one of the jury's questions.

{¶38} Thus, contrary to Appellant's suggestion on appeal, it appears counsel was present and participated in a review of the jury's questions and may have even approved the answers provided to the jury by the trial court. We are unable to confirm this, however, as there is no reference to the jury's questions other than the fact that the jury's handwritten notes, along with the trial court's written answers, are taped onto a paper in the trial transcript. What is clear, however, is that there were no proceedings held in open court in response to the jury's submission of questions. Instead, it appears the trial court simply communicated with the jury via written answers to their written questions.

{¶39} In *State v. Lee*, 8th Dist. Cuyahoga No. 104682, 2017-Ohio-1449, ¶66, the Eighth District Court of Appeals recently held that a court's "written response sent to the jury room was not a critical phase of the trial that required [the defendant's] presence." In *Lee*, much like in the case sub judice, the jury submitted written questions during their deliberations. *Id.* at ¶63. In response, the court met with the attorneys and drafted a written response that was provided to the jurors. *Id.* In reaching its decision, the *Lee* court relied upon the reasoning of *State v. Campbell*, 90 Ohio St.3d 320,

346738 N.E.2d 1178 (2000), which found no error "'where a capital murder defendant was absent from an in-chambers discussion between the court and counsel regarding the trial court's response to a jury question.'"  The *Lee* court noted that *Campbell* held as follows on this particular issue:

> "'Campbell had no right to be present at the legal discussion of how the question should be answered.  Nor did he have a right to be present when the judge sent the note to the jury room.  Although the oral delivery of jury instructions in open court is a critical stage of trial, the trial court here did not instruct the jury in open court; instead, he sent a note.  A defendant benefits from his presence, and may be harmed by his absence, when instructions are given in open court.  But these potential benefits and harms do not exist when the judge merely sends a note to the jury room.  We therefore hold that the sending of the note was not a critical stage of the trial. (Citations omitted.)  *Id.* at 346.  *See also State v. Ferguson*, 8th Dist. Cuyahoga No. 86439, 2006-Ohio-799, ¶56 (concluding that "the discussion regarding the jury question was not a critical stage of the trial.").'"  *Lee* at ¶61.

{¶41} In light of the foregoing case law and consistent with the reasoning of the Supreme Court of Ohio in *State v. Campbell*, supra, we find the trial court's provision of written answers to written questions from the jury cannot be considered a critical stage of the proceedings to which Appellant had statutory and constitutional rights to be present. Accordingly, we find no merit to Appellant's third assignment of error and it is overruled.

## ASSIGNMENT OF ERROR IV

{¶42} In his fourth assignment of error, Appellant contends the trial court's incorrect, incomplete, and confusing responses to the jury's questions amounted to an abuse of discretion and deprived him of his right to a fundamentally fair trial and reliable jury verdict. More specifically, Appellant argues the trial court abused its discretion in providing answers to questions posed by the jury during deliberations regarding (1) the voluntary manslaughter instruction; and (2) a request for a copy of the transcript containing a portion of Dwight Haddox's testimony. Appellant further argues the second question posed by the jury stemmed from a misleading argument made by the prosecutor during closing arguments, which Appellant contends rose to the level of prosecutorial misconduct. The State responds by arguing that the trial court did not abuse its discretion in answering the jury's questions in the manner that it did, and that any error in

the statements made by the prosecutor did not rise to the level of

prosecutorial misconduct.

{¶43} As recently observed by the Third District Court of Appeals in

*State v. Robinson*, 3rd Dist. Hancock No. 5-16-13, 2017-Ohio-2703, ¶17:

> "'When a jury during its deliberation requests "clarification of
>
> instructions previously given, a trial court has discretion to
>
> determine its response to that request."' *State v. Juntunen*, 10th
>
> Dist. Franklin Nos. 09AP–1108 and 09AP–1109, 2010–Ohio–
>
> 5625, ¶19, quoting *State v. Carter*, 72 Ohio St.3d 545 (1995),
>
> paragraph one of the syllabus. 'A reversal of a conviction based
>
> upon a trial court's response to such a request requires a
>
> showing that the trial court abused its discretion.' *State v.*
>
> *Castile*, 10th Dist. Franklin No. 13AP–10, 2014–Ohio–1918,
>
> ¶23, citing *Carter* at 553 and *State v. Young*, 10th Dist. Franklin
>
> No. 04AP–797, 2005–Ohio–5489, ¶35.  An abuse of discretion
>
> implies that the trial court acted unreasonably, arbitrarily, or
>
> unconscionably.  *State v. Adams*, 62 Ohio St.2d 151, 157
>
> (1980)."

The *Robinson* court further explained that:

"'A trial court's response to a jury's question "when viewed in its entirety, must constitute a correct statement of the law and be consistent with or properly supplement the jury instructions that have already been given."' *Juntunen* at ¶19, quoting *State v. Preston–Glenn*, 10th Dist. Franklin No. 09AP–92, 2009–Ohio–6771, ¶28. "'An appellate court will only find reversible error where a jury instruction has, in effect, misled the jury."' *Id*., quoting *State v. Hull*, 7th Dist. Mahoning No. 04 MA 2, 2005–Ohio–1659, ¶45, citing *Sharp v. Norfolk & W. Ry. Co.*, 72 Ohio St.3d 307, 312 (1995), and citing *Carter* at 553."

{¶44} Appellant first contends the trial court abused its discretion responding to the jury's request for a clarification on the aggravated murder, murder and voluntary manslaughter instructions. The trial transcript includes the handwritten notes from the jury containing questions for the trial court. The first question asked by the jury contained two parts and stated as follows:

"1.   If found not guilty on Aggravated Murder Count 1, do we continue to counts 2-4 and Involuntary Manslaughter or just stop at counts 1-4?

> 2.      If found not guilty on count one, do counts 2-4 still
>
>          apply?"

The trial court provided the following response to those questions:

> "First proceed through counts 1-4.  Then, read the Involuntary
>
> Manslaughter instructions on the Involuntary Manslaughter
>
> verdict form and use those as a guide to decide if Involuntary
>
> Manslaughter should be considered."[3]

{¶45} Appellant argues the question posed by the jury indicated "the

juror's confusion over its authority to consider mitigating circumstances as

laid out in voluntary manslaughter."  Appellant further argues the answer

provided by the trial court "contributed to the confusion and was, therefore,

prejudicial error."  However, as we explained in our analysis of Appellant's

second assignment of error, even assuming the trial court erred in instructing

the jury on voluntary manslaughter, because Appellant was not entitled to an

instruction on voluntary manslaughter we found no prejudice and therefore

determined the error was harmless.  The same reasoning applies to this

argument.  Because Appellant was not entitled to an instruction on voluntary

---

[3] We note that the jury's question mistakenly referred to "Involuntary Manslaughter" rather than voluntary manslaughter, and the trial court's response also used the term "Involuntary" as opposed to voluntary. Whether the use of the term "involuntary" stemmed from a substantive misunderstanding by the jury or was simply a transcription error is unknown.  However, in light of our disposition of this assignment of error, we find this mistaken reference to be harmless.

manslaughter, it cannot be argued that any error in the original instruction or in the trial court's answer to the jury's question was prejudicial. Thus, the error does not constitute reversible error.

{¶46} Next, Appellant contends the trial court abused its discretion when it denied the jury's request for a copy of a portion of the transcript containing the testimony of Dwight Haddox. The record indicates the jury sent a written question to the trial court as follows:

"Can we see the transcript of where Dwight Haddox (sp?) said

that Justin admitted he emptied the clip?"

The trial court provided the following response to the request:

"No. You will have to use your collective memories on this

issue."

Appellant argues the trial court abused its discretion in not providing a transcript of Haddox's testimony to the jury.

{¶47} In *State v. Carter*, the Supreme Court of Ohio considered an argument that the trial court abused its discretion in refusing to provide the jury with a transcript of the testimony of a trial witness. *State v. Carter,* 72 Ohio St.3d 545, 560, 651 N.E.2d 965 (1995). In reaching its decision, the Court noted that because trial counsel did not object to the trial court's refusal to provide the transcript, reversal would require a finding of plain

error.  *Id.*  The *Carter* Court ultimately found neither plain error nor an abuse of discretion in the trial court's denial of the transcript to the jury.  *Id.*

{¶48} Further, in *State v. Dingus*, 26 Ohio App.2d 131, 269 N.E.2d 923 (4th Dist. 1970), this Court was presented with an argument that the trial court erred in refusing to allow the testimony of a witness to be read to the jury, as requested by the jury during deliberations.  *Id*. at 132.   It appears that the court did not have the requested testimony and did not state its recollection of the witness's testimony for jury.  *Id*. at 134.  Instead, the court instructed the jury "to apply testimony from its recollection."  Finding no mandatory or statutory requirement that testimony be read to a jury, this Court found no abuse of discretion.  *Id.* at 135.

{¶49} Again, as set forth above, the State has represented to this Court that both counsel and the court reviewed the jury's questions and agreed upon answers to be provided to the jury.  Further, post-trial filings by Appellant's trial counsel indicate counsel was aware of the questions posed by the jury.  Additionally, Appellant's motion for a new trial does not reference any objection to the answers provided by the trial court to the jury.  Thus, in line with *Carter*, only a finding of plain error will result in reversal on this assigned error.

{¶50} Here, a review of the record reveals that Haddox testified at trial regarding contact he had with Appellant in the days after the offenses at issue herein were committed. Haddox testified that while Appellant was riding in the car with him on the afternoon after the victim was murdered, Appellant stated he had killed the victim. He further testified that Appellant was in the car with him again the next day and was talking with his sister. The following exchange appears in the transcript:

"Q:   Did he tell you anything about pulling the trigger?

A:    Something I heard, I don't know the exact words, but something about emptied the gun."

There were no follow-up questions on direct examination and no cross-examination regarding this testimony. Subsequently, during closing arguments, the prosecutor made the following statement in reference to Haddox's testimony:

"Now the next day the defendant finally returned to Pickaway County when he asked Dwight Haddox for a ride to Hagerty Road. And he again had his head down in the car saying, "I emptied the clip. I killed him."

{¶51} Appellant contends this statement by the prosecutor was a misstatement and exaggeration of the Haddox's testimony and the trial court

had a duty to give the jury instructions to neutralize the prejudice caused by the prosecutor's conduct. We initially note that, in our view, the statement by the prosecutor was similar to the testimony of Haddox and did not constitute a misrepresentation or an exaggeration of his testimony. Further, the jury heard the testimony in full and was also instructed that statements by counsel during opening and closing arguments are not evidence. Moreover, reviewing Haddox's testimony as a whole, we find no substantive distinction between Haddox's testimony that Appellant said something to the effect that he "emptied the gun" versus the State's comment in closing that he "emptied the clip." Thus, based upon the facts presently before us as well as our prior reasoning in *Dingus*, supra, we cannot conclude the trial court plainly erred or abused its discretion in denying the jury's request for the transcript and instead instructing them that they must rely on their collective memories.

{¶52} Finally, with respect to Appellant's additional argument that the jury's second question stemmed from a misleading argument made by the prosecutor regarding Haddox's testimony during closing arguments, we conclude that an argument raising a claim of prosecutorial misconduct should have been separately assigned and argued, as required by App.R. 16(A). Instead, Appellant has raised a detailed claim of prosecutorial

misconduct as part of an assignment of error alleging an abuse of discretion on the part of the trial court in providing written answers to questions submitted by the jury during deliberations. As such, disregard this portion of Appellant's argument in accordance with the discretion provided us in App.R. 12(A)(2).

{¶53} Accordingly, having found no merit under Appellant's fourth assignment of error, it is overruled.

## ASSIGNMENT OF ERROR V

{¶54} In his fifth assignment of error, Appellant contends he was denied his constitutional right to the effective assistance of counsel due to the combined prejudicial impact of instances of deficient performance. Thus, Appellant essentially contends that cumulative errors by defense counsel affected the outcome of his trial. The State contends there is no evidence that but for the alleged deficiencies of defense counsel the trial would have had a different outcome, in light of the significant amount of other evidence which led to the conclusion Appellant was guilty of the indicted offenses.

{¶55} To prevail on a claim of ineffective assistance of counsel, a criminal appellant must establish (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable

representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶113; *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Knauff*, 4th Dist. Adams No. 13CA976, 2014-Ohio-308, ¶23.  In Ohio a properly licensed attorney is presumed competent. *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶62. Thus, in reviewing a claim of ineffective assistance of counsel, we must indulge in "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Strickland* at 697. Failure to satisfy either part of the test is fatal to the claim.  *Id.*; *State v. Bradley*, 42 Ohio St.3d 136, 143, 538 N.E.2d 373 (1989).

{¶56} Appellant alleges five instances of ineffective assistance by his trial counsel as follows:

"1.    Defense counsel's inept cross-examination of the lead

detective resulted in the jury learning about Blevin's post-arrest

exercise of his privilege against self-incrimination."

"2. Defense counsel's inept cross-examination of the lead detective regarding his theory of the case resulted in the jury hearing his opinion that Blevins is guilty of murder."

"3. Defense counsel failed to object to blatantly inadmissible 'other acts' testimony that portrayed Blevins as an individual having a propensity for violence involving the use of firearms."

"4. Defense counsel failed to effectively impeach Dwight Haddox's testimony regarding his recollection of statements relating to the shooting, failed to object to the prosecutor's misrepresentation of his testimony, and failed to object to the trial judge's inadequate response to the jury's questions regarding the testimony."

"5. Defense counsel failed to object to a defective voluntary manslaughter instructions [sic] and to the judge's erroneous response to the jury's questions expressing confusion regarding the instructions."

{¶57} Appellant's first and second allegations of ineffective assistance both claim that his trial counsel ineptly cross-examined Detective Jeffery George. First, Appellant argues his trial counsel's inept cross examination of Detective George led to the jury learning about his post-

arrest exercise of his privilege against self-incrimination.  A review of the record reveals the following exchange during trial between defense counsel and the detective:

"Q:     Were you aware of the fact that my client went to Bret Taylor's immediately after this murder?

A:     I was not aware of that.  No.

Q:     You weren't aware of that until today?

A:     Today is the first I heard that your client – your client nor Bret Taylor would not speak with me.

Q:     Okay.  So Bret wouldn't cooperate?

A:     No.  He asked for a lawyer."

Another exchange took place during later cross-examination as follows:

"Q:     Were you present when Mr. Blevins was arrested?

A:     Yes, I was.

Q:     And what was he wearing?

A:     I don't remember.

Q:     He wasn't wearing red basketball shorts, was he?

A:     No.

Q:     So do you have an explanation of how a guy that wears red basketball shorts – when did you arrest him?

A:      It was like a week later after the murder.

Q:      After the murder, a week?

A:      Yea.  Approximately a couple days to a week.

Q:      All right.  Do you know where my client went?

A:      No.  Again, your client wouldn't speak with me.

Q:      Well, I understand that.  But in the end here you've never investigated where Mr. Blevins ended up within an hour or so after the shooting?

A:      Right after the shooting, no.  All I know is he had went to McArthur after that.

Q:      Well that's the point I'm making.  Do you have any indication that my client left the Arnett apartment driving Bret – do you know if Bret Taylor's car was there?

A:      That I do not know."

Thus, two different times, in response to two different questions, the detective referenced the fact that Appellant would not speak with him, and thus had exercised his constitutional right against self-incrimination.

{¶58} Appellant concedes that the detective's answers were not responsive to the questions asked by counsel, but he argues the open-ended manner in which counsel framed his questions allowed the detective to slip

his post-arrest silence into his answers.  Appellant cites this Court's prior

reasoning in *State v. Harper*, 4th Dist. Vinton No. 11CA684, 2012-Ohio-

4527, for the proposition that an attorney's failure to take measures to

prevent the jury form hearing testimony regarding his client's post-arrest

silence may constitute deficient performance.  We noted in *Harper* as

follows at ¶16:

> "'An accused who asserts his Fifth Amendment right to silence
>
> should not have the assertion of that constitutional right used
>
> against him.'  *State v. Treesh*, 90 Ohio St.3d 460, 479, 739
>
> N.E.2d 749 (2001), citing *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct.
>
> 2240, 49 L.Ed.2d 91 (1976). '[E]vidence introduced by the state
>
> during its case in chief regarding the defendant's exercise of his
>
> right to remain silent during interrogation violates the Due
>
> Process Clause of both the state and federal constitutions.'
>
> *State v. Perez,* 3d Dist. No. 4–03–49, 2004–Ohio–4007, ¶10,
>
> citing *Leach*, 102 Ohio St.3d 135, 2004–Ohio–2147, 807
>
> N.E.2d 335, at ¶16–18.  'This rule enforces one of the
>
> underlying policies of the Fifth Amendment, which is to avoid
>
> having the jury assume that a defendant's silence equates with
>
> guilt.'  *Id*., citing *Leach*, 2004–Ohio–2147, at ¶30; *Murphy v.*

*Waterfront Comm. of New York Harbor*, 378 U.S. 52, 55, 84

S.Ct. 1594, 12 L.Ed.2d 678 (1964)."

{¶59} Harper involved an allegation that defense counsel failed to

object to repeated instances of the State eliciting testimony that the

defendant had invoked his right against self-incrimination. *Id.* at ¶28. Here,

however, it was not the State that elicited the problematic testimony, it was

defense counsel while cross-examining the State's witness. Further, the case

at bar does not involve a situation where the State was attempting to use

Appellant's silence against him. As noted by Appellant in his brief, the

detective's answers were not responsive to the question asked by defense

counsel. Moreover, Harper involved repeated instances of the State drawing

the juror's attention to the defendant's post-arrest silence, constitutional

violations which this Court stated "pervaded the entire trial." *Id.* at ¶33.

Here, there were two quick references to Appellant's post-arrest silence that

were unintentionally elicited during cross-examination, which can hardly be

described as pervading the entire trial. Thus, we cannot conclude, based

upon the facts before us, that defense counsel should have anticipated the

detective's answer to the question would have included a reference to

Appellant's post-arrest silence. As such, Appellant has not demonstrated

deficient performance by his counsel in this regard and, as a result, we find no merit to this portion of Appellant's argument.

{¶60} Second, Appellant argues his trial counsel's inept cross examination of Detective George regarding his theory of the case resulted in the jury hearing his opinion that Appellant was guilty of murder. A review of the trial transcript reveals the following exchange during defense counsel's cross examination of Detective George:

"Q: All right. Now, let's go through the stage of the proceeding here. So you determined that prolifically [sic] what the relationship was between Sammy Nicholson, Darrell Arnett, Chloe, my client, so you understand those people were involved?

A: Yes.

Q: All right. Now, what's your theory of what happened here?

A: Honestly, my theory, I believe your client committed the murder of Sammy Nicholson.

Q: Well, tell me what your theory is, why he was there?

A: I have no reason. Possibly the drugs that everybody talked about.

Q:      Well, were you aware of the fact that there was [sic]

mutual threats:

A:      Briefly I might have heard that."

{¶61} The State contends that defense counsel was attempting to elicit

testimony from the detective indicating the condition of the apartment

showed signs of a struggle, which would lend support to Appellant's self-

defense argument.  As such, the State argues defense counsel's question falls

within the gambit of trial strategy.  However, we tend to agree with

Appellant's argument that "[t]here can be no conceivable strategic reason for

a defense attorney to ask the lead detective in a homicide investigation an

open-ended question that invites, or even encourages, the witness to offer a

damaging opinion regarding the defendant's guilt."  Thus, we agree with

Appellant's argument that this action constituted deficient performance by

trial counsel.

{¶62} Despite this finding, based upon the record before us we find

no prejudice within the meaning of the *Strickland* test because the result of

the trial would have been no different.  Here, Appellant's only arguments on

appeal regarding his culpability for the charged crimes are 1) he did not act

with prior calculation and design; and 2) although he killed the victim, he

did so as a result of provocation or in self-defense.  As we have referenced

multiple times herein, Appellant was not entitled a voluntary manslaughter instruction.  Thus, his only viable theory at trial was one of self-defense, which is an affirmative defense.  An affirmative defense does not negate the legal adequacy of the state's proof for purposes of submitting it to the jury.  An affirmative defense involves an excuse or justification for doing an otherwise illegal act.  See R.C. 2901.05(C)(2).  It does not deny the existence of the act; it simply provides a legal justification for it.  Thus, eliciting the detective's theory of the case did not place any testimony before the jury Appellant had not already conceded.  Accordingly, Appellant cannot demonstrate prejudice as a result of counsel's actions and we therefore find no merit to this portion of his argument.

{¶63} Appellant's third allegation of ineffective assistance of counsel argues defense counsel failed to object to blatantly inadmissible "other acts" testimony that portrayed him as an individual having a propensity for violence involving the use of firearms.  More specifically, Appellant argues that defense counsel failed to object to testimony from Chloe Brady indicating she stopped living with Appellant because she "overheard him behind a closed door and he said he was going to put a bullet in [her] head."  The State does not respond to this allegation of ineffective assistance of counsel in its appellate brief.

{¶64} Again, Appellant admitted at trial that he went to the victim's house armed with a loaded gun and shot the victim multiple times. Further, he does not dispute that he caused the victim's death, but only that he acted in self-defense. The State introduced evidence that the victim died from multiple gun shot wounds. Additionally, expert testimony indicated several of the gunshot wounds were sustained while the victim was in a defensive position with his arms up trying to shield himself, and in a downward trajectory, contrary to Appellant's argument that he shot the victim after the victim knocked him to the floor. Other evidence demonstrated all of the bullet holes and recovered bullets were on the side of the room where the victim was found deceased, and none were found anywhere else, indicating the victim did not shoot first or shoot back. Finally, Appellant admitted he sent a message stating he needed to "take care of some b.s" along with a photo of his gun to a friend, thus demonstrating a propensity for violence by his own actions and testimony. In light of the foregoing, even assuming there was no sound trial strategy that permitted defense counsel's failure to object, and to instead to ask further questions about Appellant's alleged statements on cross examination, Appellant cannot demonstrate the result of the trial would have been different. Therefore, he cannot establish

ineffective assistance of counsel in this regard and we find no merit to this portion of his argument.

{¶65} Appellant's fourth allegation of ineffective assistance of counsel claims trial counsel 1) failed to effectively impeach Dwight Haddox's testimony regarding his recollection of statements relating to the shooting; 2) failed to object to the prosecutor's misrepresentation of his testimony; and 3) failed to object to the trial judge's inadequate response to the jury's question. Appellant first argues that trial counsel was ineffective for failing to effectively impeach Dwight Haddox in response to the following testimony:

"Q:    Did he [Appellant] tell you anything about pulling the trigger?

A:    Something I heard, I don't know the exact words, but something about emptied the gun."

Q:    Did he tell you anything about being on the run?

A:    I kind of figured after that that he was on the run.  I didn't know.  I mean like I said, after all that, and I was by myself, like I say, after it all happened, then it sinks in and started thinking about everything and I thought well, I think that I better go to the Sheriff's station."

Appellant argues his trial counsel admitted in a motion for new trial that had he heard the statement by Haddox about the gun being emptied that he would have objected and then impeached the witness with a recording of his police interview and also called Appellant's mother to testify to contradict Haddox. Appellant points to the affidavit of Appellant's mother that was attached in support of the motion for new trial, in which Mrs. Blevins avers that she and Haddox had a falling out and that he made threats that her son would "[go] down."

{¶66} Considering Appellant's trial counsel represented to the trial court that his failure to object was not trial strategy, and that he would have objected to Haddox's testimony had he heard it, we conclude Appellant has demonstrated deficient performance by his trial counsel. However, in light of the fact that Appellant admitted to shooting the victim multiple times, as well as testimony from Special Agent Todd Fortner that when Appellant's gun was found it was kicked back and open, indicating the gun was "completely expended," we cannot conclude trial counsel's failure to object to Haddox's testimony affected the outcome of the trial. Thus, because Appellant cannot demonstrate prejudice, he has failed to demonstrate ineffective assistance of counsel.

{¶67} Turning our attention now to Appellant's second and third claims, which allege trial counsel failed to make proper objections, we observe that "[a] trial counsel's failure to object is generally viewed as trial strategy and does not establish ineffective assistance." *State v. Teets*, 4th Dist. Pickaway No. 16CA3, 2017-Ohio-7372, ¶71; citing *State v. Roby*, 3rd Dist. Putnam No. 12–09–09, 2010–Ohio–1498, ¶44 (additional internal citations omitted). Appellant notes that in a post-trial motion for new trial filed by Appellant's trial counsel, counsel stated the failure to object here was not trial strategy. Trial counsel instead attributed his failure to object to "physical inattention." However, we have already determined under Appellant's fourth assignment of error that the prosecutor's reference to Haddox's statement during closing arguments was generally consistent with Haddox's testimony and was not a gross exaggeration or misrepresentation. We also determined under Appellant's fourth assignment of error that the trial court did not plainly err or abuse its discretion in responding to the jury's request for a transcript of Haddox's trial testimony with a denial and an instruction that the jury must rely on its collective memories regarding the testimony. Thus, assuming arguendo Appellant has demonstrated deficient performance, we cannot conclude he has demonstrated he has

suffered any prejudice as a result. Thus, we find no merit to this portion of Appellant's argument.

{¶68} Finally, in light of our determination that Appellant was not entitled to a jury instruction on voluntary manslaughter, we summarily reject Appellant's fifth claim of ineffective of counsel, which alleges trial counsel was ineffective based upon his failure to object to defective voluntary manslaughter instructions.

{¶69} Under the cumulative-error doctrine, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995); citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus; *State v. Ruble*, 2017-Ohio-7259, 96 N.E.3d 792, ¶75 (4th Dist.). "Before we consider whether 'cumulative errors' are present, we must first find that the trial court committed multiple errors." *State v. Smith*, 2016-Ohio-5062, 70 N.E.3d 150, ¶106 (4th Dist.); citing *State v. Harrington*, 4th Dist. Scioto No. 05CA3038, 2006-Ohio-4388, ¶57. The cumulative error doctrine does not apply where the defendant "cannot point to 'multiple instances of harmless error.'" *See State v. Mammone*, 139 Ohio

St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶148 (2014) ("And to the extent that Mammone more broadly invokes the doctrine of cumulative error, that doctrine does not apply because he cannot point to 'multiple instances of harmless error.'" *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995).). Based upon our analysis of the arguments raised under this assignment of error, we conclude the doctrine of cumulative error does not apply here. Accordingly, Appellant's fifth assignment of error is overruled.

## ASSIGNMENT OF ERROR VI

{¶70} In his sixth assignment of error, Appellant contends that the jury's verdicts of guilty for aggravated murder, murder, and felonious assault are against the manifest weight of the evidence. The State contends the evidence taken as a whole clearly pointed to the jury's finding of guilt on all counts, and that there is nothing in the record to suggest the jury lost its way and created a manifest miscarriage of justice. We begin with a look at the proper standard of review for manifest weight challenges.

## STANDARD OF REVIEW

{¶71} When an appellate court considers a claim that a conviction is against the manifest weight of the evidence, the court must dutifully examine the entire record, weigh the evidence and all reasonable inferences,

and consider the witness credibility. *State v. Dean*, 146 Ohio St.3d 106, 2015–Ohio–4347, 54 N.E.3d 80, ¶151; citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A reviewing court must bear in mind, however, that credibility generally is an issue for the trier of fact to resolve. *State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); *State v. Murphy*, 4th Dist. Ross No. 07CA2953, 2008–Ohio–1744, ¶31. "'Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility.'" *Barberton v. Jenney*, 126 Ohio St.3d 5, 2010–Ohio–2420, 929 N.E.2d 1047, ¶20; quoting *State v. Konya*, 2nd Dist. Montgomery No. 21434, 2006–Ohio–6312, ¶6; quoting *State v. Lawson*, 2nd Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). As the court explained in *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d 517, at ¶21:

> "'[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment must be made in favor of the judgment and the finding of facts.
>
> * * *

If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.' *Id.* at ¶21, 972 N.E.2d 517, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn.3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978)."

Thus, an appellate court will leave the issues of weight and credibility of the evidence to the fact-finder, as long as a rational basis exists in the record for its decision. *State v. Picklesimer*, 4th Dist. Pickaway No. 11CA9, 2012–Ohio–1282, ¶24; *accord State v. Howard*, 4th Dist. Ross No. 07CA2948, 2007–Ohio–6331, ¶6 ("We will not intercede as long as the trier of fact has some factual and rational basis for its determination of credibility and weight.").

{¶72} Once the reviewing court finishes its examination, the court may reverse the judgment of conviction only if it appears that the fact-finder, when resolving the conflicts in evidence, "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered .'" *Thompkins* at 387; quoting *State v. Martin*, 20

Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).  If the prosecution

presented substantial credible evidence upon which the trier of fact

reasonably could conclude, beyond a reasonable doubt, that the essential

elements of the offense had been established, the judgment of conviction is

not against the manifest weight of the evidence.  *E.g., State v. Eley*, 56 Ohio

St.2d 169, 383 N.E.2d 132, syllabus (1978), superseded by state

constitutional amendment on other grounds in *State v. Smith*, 80 Ohio St.3d

89, 684 N.E.2d 668 (1997).  *Accord Eastley* at ¶12; quoting *Thompkins*, 78

Ohio St.3d at 387; quoting Black's Law Dictionary 1594 (6th ed.1990)

(explaining that a judgment is not against the manifest weight of the

evidence when "'the greater amount of credible evidence'" supports it).

Thus, "'[w]hen conflicting evidence is presented at trial, a conviction is not

against the manifest weight of the evidence simply because the jury believed

the prosecution testimony.'"  *State v. Cooper*, 170 Ohio App.3d 418, 2007–

Ohio–1186, 867 N.E.2d 493, ¶17; quoting *State v. Mason*, 9th Dist. Summit

No. 21397, 2003–Ohio–5785, ¶17; quoting *State v. Gilliam*, 9th Dist. Lorain

No. 97CA006757 (Aug. 12, 1998).  Instead, a reviewing court should find a

conviction against the manifest weight of the evidence only in the

"'exceptional case in which the evidence weighs heavily against the

conviction.'" *Thompkins* at 387; quoting *Martin* at 175. *Accord State v. Lindsey*, 87 Ohio St.3d 479, 483, 721 N.E.2d 995 (2000).

{¶73} In the case presently before us, Appellant has disputed the jury's determination he murdered the victim with prior calculation and design. However, we have already rejected Appellant's argument that the finding of prior calculation and design was not supported by sufficient evidence. Further, Appellant does not dispute that he purposely killed the victim, which serves as the basis for his aggravated murder, murder and felonious assault convictions. Instead, he argues that the jury committed a manifest miscarriage of justice by rejecting his claim of self-defense. He also argues the jury created a manifest miscarriage of justice by rejecting his argument that he acted in a fit of sudden passion or rage as a result of provocation. However, as set forth above, we have already determined that Appellant was not entitled to a voluntary manslaughter instruction, even based upon his own version of events. Thus, we limit our review to whether the jury committed a manifest miscarriage of justice by rejecting his claim of self-defense.

## SELF-DEFENSE

{¶74} "Self-defense is an affirmative defense that, if proved, relieves a defendant of criminal liability for the force that the defendant used." *State*

*v. Kozlosky*, 195 Ohio App.3d 343, 2011–Ohio–4814, 959 N.E.2d 1097, ¶22.

"'The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense, is upon the accused.'" *State v. Nucklos*, 121 Ohio St.3d 332, 2009–Ohio–792, 904 N.E.2d 512, ¶7; quoting R.C. 2901.05(A). We observe that affirmative defenses such as self-defense "'do not seek to negate any of the elements of the offense which the State is required to prove' but rather they 'admit[ ] the facts claimed by the prosecution and then rel[y] on independent facts or circumstances which the defendant claims exempt him from liability.'" *State v. Smith*, 3rd Dist. Logan No. 8–12–05, 2013–Ohio–746, ¶32; quoting *State v. Martin*, 21 Ohio St.3d 91, 94, 488 N.E.2d 166 (1986).

{¶75} To establish self-defense, a defendant must establish, by a preponderance of the evidence, the following three circumstances:

"'(1) the defendant was not at fault in creating the violent situation, (2) the defendant had a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape was the use of force, and (3) that the defendant did not violate any duty to retreat or avoid the danger.'" *State v. Goff*, 128 Ohio St.3d 169, 2010–Ohio–6317,

942 N.E.2d 1075, ¶36; quoting *State v. Thomas*, 77 Ohio St.3d

323, 326, 673 N.E.2d 1339 (1997).

The "elements of self-defense are cumulative. * * * [Thus, i]f the defendant

fails to prove *any one* of these elements by a preponderance of the evidence

he has failed to demonstrate that he acted in self-defense." *State v. Jackson*,

22 Ohio St.3d 281, 284, 490 N.E.2d 893 (1986). *Accord State v. Cassano*,

96 Ohio St.3d 94, 2002–Ohio–3751, 772 N.E.2d 81, ¶73; *State v. Hargrave*,

4th Dist. Adams No. 11CA907, 2012–Ohio–798, ¶16.

## LEGAL ANALYSIS

{¶76} With regard to the first element, which considers whether

Appellant was at fault in creating the violent situation, the State's theory at

trial was that Appellant entered the victim's residence by force and shot him

to death with prior calculation and design. In support of its theory the State

relied upon evidence of prior text messages sent by Appellant that included a

photo of a gun in his possession, which was later identified as the murder

weapon. We have already determined the jury's finding of prior calculation

and design was supported by sufficient evidence. Appellant contends, on the

other hand, that he simply went to the victim's residence at 5:00 in the

morning to pay him $700.00 worth of money he owed, armed with a gun he

usually carried for his own protection, and that the victim initiated a physical

confrontation and pushed Appellant to the ground.  Believing the victim to be armed, based upon prior threats made by the victim, Appellant claims he shot first lest he be shot.  Appellant argues the text messages and witness testimony introduced at trial "affirmatively established threatening, provocative behavior on the part of the decedent" towards Appellant.   He also alleged the text messages that included the photo of his gun were sent in reference to a disagreement with someone else, not the victim, and thus had no bearing on the actions he took on the night in question.  Appellant settles upon an argument that the "real issue" is whether the shooting was fully justified as an act of self-defense or partially justified as an act committed in a sudden fit of rage due to provocation."

{¶77} We initially note that Appellant's arguments that he acted both 1) in self-defense out of fear; and 2) in a sudden fit of rage due to provocation, seem to be somewhat contradictory, as the underlying motivations for actions resulting from fear versus provocation differ.  Other courts have reasoned that, at a minimum, fear is insufficient to demonstrate the emotional states of passion or sudden fit of rage.  *See State v. Ramey*, 2nd Dist. Montgomery No. 27636, 2018-Ohio-3072, ¶36 (concluding the appellant was not overcome by sudden passion or a sudden fit of rage, based upon the testimony, because "fear is insufficient to demonstrate the

emotional states of sudden passion or a fit of rage."); quoting *State v. Williams*, 7th Dist. Jefferson No. 11 JE 7, 2012-Ohio-5256, ¶24; *Accord State v. Beatty-Jones*, 2d Dist. Montgomery No. 24245, 2011-Ohio-3719, ¶30.  Further, this Court has held that "evidence supporting the privilege of self-defense, i.e., that the defendant feared for [her] own and [others'] personal safety, does not constitute sudden passion or a fit of rage as contemplated by the voluntary manslaughter statute."  *State v. Goff*, 4th Dist. Lawrence No. 11CA20, 2013-Ohio-42, ¶52; citing *State v. Harris*, 129 Ohio App.3d 527, 535, 718 N.E.2d 488 (10th Dist.1998).  As further explained in *Goff*, "'While self-defense requires a showing of fear, voluntary manslaughter requires a showing of rage, with emotions of "anger, hatred, jealously, and/or furious resentment.'"  *Goff* at ¶52; quoting *State v. Levett*, 1st Dist. Hamilton No. C–040537, 2006–Ohio–2222, ¶29; in turn quoting *State v. Perdue*, 153 Ohio App.3d 213, 2003–Ohio–3481, 792 N.E.2d 747, ¶12 (7th Dist.); in turn quoting *Harris* at 535 (additional internal citations omitted).

{¶78} Again, as we have already concluded Appellant was not entitled to a jury instruction on voluntary manslaughter, we limit our analysis to his self-defense argument.  We do not believe, based upon the evidence in the record, that Appellant demonstrated by a preponderance of

the evidence that he was not at fault in creating the violent situation.

Accepting Appellant's testimony as true, Appellant went to the victim's

residence in what was essentially the middle of the night, armed with a gun

and anticipating a shootout. Considering the evidence presented at trial, and

interpreting that evidence in favor of the guilty, as we are required to do

when considering a manifest weight of the evidence argument, the evidence

reveals that Appellant went to the victim's residence after texting a

photograph of his gun, along with a comment that he needed to go "take care

of some b.s.," to various other individuals, where he proceeded to shoot the

victim multiple times, resulting in his death. Based upon the foregoing, we

cannot conclude Appellant has met his burden with respect to the first

element of self-defense.

{¶79} However, assuming arguendo that Appellant demonstrated the

first element of the affirmative defense of self-defense by a preponderance

of the evidence, we move on to a review of the second, cumulative element

required to be proven. In a deadly force case, the second element of self-

defense requires a defendant to show that the defendant had a bona fide

belief that he was in imminent danger of death or great bodily harm and that

his only means of escape was the use of deadly force. *See State v. Cassano*,

96 Ohio St.3d 94, 2002–Ohio–3751, 772 N.E.2d 81, ¶76; quoting *State v.*

*Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755, paragraph two of the syllabus (1979) (determining that defendant had "no basis for a 'bona fide belief that he was in imminent danger of death or great bodily harm' and could 'escape from such danger' only by using deadly force"). This second element "is a combined subjective and objective test." *Thomas* at 330. The defendant's belief must be objectively reasonable under the circumstances, and he must subjectively believe he needed to resort to deadly force to defend himself. *Id.* at 330–331. "Thus, the jury first must consider the defendant's situation objectively, that is, whether, considering all of the defendant's particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack, she reasonably believed she was in imminent danger." *Id.* at 330; *accord State v. Hendrickson*, 4th Dist. Athens No. 08CA12, 2009–Ohio–4416, 2009 WL 2682158, ¶30. "Then, if the objective standard is met, the jury must determine if, subjectively, this particular defendant had an honest belief that she was in imminent danger." *Thomas* at 331.

{¶80} Another component contained within the second element is the defendant's bona fide belief that the use of force was "reasonably necessary to repel the attack." *Hendrickson* at ¶29; citing *State v. Williford*, 49 Ohio St.3d 247, 249, 551 N.E.2d 1279 (1990); citing *State v. McLeod*, 82 Ohio

App. 155, 157, 80 N.E.2d 699 (9th Dist.1948). In other words, a defendant

must show that "that the degree of force used was 'warranted' under the

circumstances and 'proportionate' to the perceived threat." *Hendrickson* at

¶31; citing *State v. Palmer*, 80 Ohio St.3d 543, 564, 687 N.E.2d 685 (1997).

"If * * * the amount of force used is so disproportionate that it shows an

'unreasonable purpose to injure,' the defense of self-defense is unavailable."

*State v. Macklin*, 8th Dist. Cuyahoga No. 94482, 2011–Ohio–87, ¶27;

quoting *State v. Speakman*, 4th Dist. Pickaway No. 00CA035, 2001 WL

315198 (Mar. 27, 2001). *Accord State v. Kimmell*, 3rd Dist. Wyandot No.

16–10–06, 2011–Ohio–660, ¶20; quoting *Hendrickson* at ¶33 ("Self-defense

* * * is inappropriate if the force used is 'so grossly disproportionate as to

show revenge or as [a] criminal purpose.'"). "[I]t is only when one uses a

greater degree of force than is necessary under all the circumstances that it is

not justifiable on the ground of self-defense." *McLeod* at 157. As we

explained in *State v. Bundy*, 2012–Ohio–3934, 974 N.E.2d 139, 156–58,

¶56:

> "'Any civilized system of law recognizes the supreme value of
>
> human life, and excuses or justifies its taking only in cases of
>
> apparent absolute necessity. '"[*State v.*] *Pellegrino*, 577 N.W
>
> .2d [590,] 596, quoting *People v. Jones*, 191 Cal.App.2d 478,

12 Cal.Rptr. 777, 780 (1961).  Thus, when "'the character and manner of the [attack] do not reasonably create a fear of great bodily harm, there is no cause for the exaction of human life.'" *Id.*, quoting *People v. Ceballos*, 12 Cal.3d 470, 116 Cal.Rptr. 233, 238, 526 P.2d 241, 246 (1974).

{¶81} As set forth above, we believe Appellant's claims that he both acted in self-defense out of fear, but also acted in a fit of rage or sudden passion as a result of provocation are somewhat incompatible from a logical standpoint.  Although we are limiting our analysis to the question of whether Appellant demonstrated he acted in self-defense by a preponderance of the evidence, we take this opportunity to note that case law tells us, at least with regard to the mitigating claim of provocation, that a "'victim [is] within his rights in using reasonable force to repel [a] defendant from his home.  Thus, his act of [shoving] the defendant could not provide the "serious provocation" to reduce the defendant's conduct from [murder] to manslaughter.'"  *State v. Ramey*, *supra,* at ¶35; quoting *State v. Johnston*, 2rd Dist. Montgomery No. 19019, 2002 WL 1393988, *3 (June 28, 2002).

{¶82} Here, the State introduced evidence at trial indicating the victim received multiple gunshot wounds to his arms which were received in a defensive position, with his arms up trying to shield himself.  Additionally,

the State introduced evidence that the victim sustained multiple gunshot wounds that entered his body from the back and at close range, indicating he was not the aggressor. Further, evidence introduced at trial demonstrated that all of the bullet holes and recovered bullets were found on the side of the apartment where the victim was found, and none were found in any other area of the apartment, permitting an inference that the victim was shot at, but did not shoot first or shoot back.

{¶83} After a review of the record we conclude that here, the jury could have justifiably determined that the character and manner of the victim's attack upon Appellant did not warrant the use of deadly force. Although Appellant may have anticipated the victim intended to eventually use deadly force upon him, Appellant's own version of events fails to demonstrate that the victim actually used such force upon him that it threatened Appellant's life or placed him in danger of great bodily harm. Instead, even accepting Appellant's own version of events as true, the evidence shows that the victim pushed, or shoved Appellant to the ground, which led Appellant to fire multiple shots, not just one shot to injure.

{¶84} Further, rejecting Appellant's version of the events and instead accepting the State's version of events, which the jury was free to do, the evidence demonstrated Appellant murdered the victim with prior calculation

and design, with the victim sustaining multiple lethal gunshot wounds, some even from behind.  Thus, we do not believe Appellant has proven the second, cumulative element of the affirmative defense of self-defense by a preponderance of the evidence, and as such he has failed to demonstrate that he acted in self-defense.  *See State v. Jackson*, *supra*, at 284.  Accordingly, the jury had a sound basis to reject Appellant's claim of self-defense.

{¶85} In light of our conclusion that the evidence supports a finding that Appellant used more force than necessary to "repel the attack," any argument concerning the remaining element of self-defense has been rendered moot.  See *Jackson*, *supra* (explaining that failure on any element means defendant did not act in self-defense).  Therefore, we do not address it. See App.R. 12(A)(1)(c).  Further, after our review, based upon the totality of the evidence contained in the record, we are unable to conclude that Appellant's convictions for aggravated murder, murder and felonious assault are against the manifest weight of the evidence.  Accordingly, based upon the foregoing reasons, we hereby overrule Appellant's sixth assignment of error.

## ASSIGNMENT OF ERROR VII

{¶86} In his seventh assignment of error, Appellant contends the record clearly and convincingly does not support the imposition of a life

prison term with parole eligibility after serving thirty years. More specifically, Appellant argues the trial court "failed to give any consideration to [his] youth at the time of the homicide, when making the parole eligibility determination." Appellant also argues the trial court did not properly consider the "less serious" factors when balancing the seriousness and recidivism factors before imposing sentence. The State contends, however, the record clearly and convincingly supports Appellant's sentence.

{¶87} When reviewing felony sentences, appellate courts must apply the standard of review set forth in R.C. 2953.08(G)(2). *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶1, 22-23. Under R.C. 2953.08(G)(2), "[t]he appellate court's standard for review is not whether the sentencing court abused its discretion." Instead, R.C. 2953.08(G)(2) provides that an appellate court may increase, reduce, modify, or vacate and remand a challenged felony sentence if the court clearly and convincingly finds either:

> "(a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;
>
> (b) That the sentence is otherwise contrary to law."

{¶88} Although R.C. 2953.08(G)(2)(a) does not mention R.C. 2929.11 and 2929.12, the Supreme Court of Ohio has determined that the same standard of review applies to those statutes. *Marcum* at ¶23 (although "some sentences do not require the findings that R.C. 2953.08(G)(2)(a) specifically addresses[,] * * * it is fully consistent for appellate courts to review those sentences that are imposed solely after consideration of the factors in R.C. 2929.11 and 2929.12 under a standard that is equally deferential to the sentencing court"); *State v. Butcher*, 4th Dist. Athens No. 15CA33, 2017-Ohio-1544, ¶84. Consequently, "an appellate court may vacate or modify any sentence that is not clearly and convincingly contrary to law only if the appellate court finds by clear and convincing evidence that the record does not support the sentence." *Marcum* at ¶23; *Butcher* at ¶84.

{¶89} "Once the trial court considers R.C. 2929.11 and 2929.12, the burden is on the defendant to demonstrate by clear and convincing evidence that the record does not support his sentence." *State v. Akins-Daniels*, 8th Dist. Cuyahoga No. 103817, 2016-Ohio-7048, ¶9; *State v. O'Neill*, 3rd Dist. Allen No. 1-09-27, 2009-Ohio-6156, fn. 1. "Clear and convincing evidence is 'that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will

produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *State ex rel. Husted v. Brunner*, 123 Ohio St.3d 288, 2009-Ohio-5327, 915 N.E.2d 1215, ¶18; quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118, paragraph three of the syllabus (1954).

{¶90} We initially conclude that Appellant's sentence is not clearly and convincingly contrary to law. The trial court imposed a life prison term with parole eligibility after serving thirty years. R.C. 2929.03 permits the imposition of a life prison term with parole eligibility after serving either, twenty, twenty-five, or thirty years, for the offense of aggravated murder. That statute also permits the imposition of a life sentence without parole. Thus, the sentence imposed by the trial court here did not constitute the maximum sentence for the offense and was provided for by the statute. Further, Appellant does not argue that his sentence is contrary to law. Instead, as set forth above, Appellant essentially argues his sentence is not supported by the record because the trial court did not properly consider the "less serious" factors contained in R.C. 2929.12(C)(1)(3) and (4) and did not properly take into consideration his age as a mitigating factor when imposing sentence.

{¶91} We first address Appellant's argument that the trial court failed to take into consideration the fact that he was only nineteen years old at the time the homicide occurred. Appellant cites *State v. Wade*, 2018-Ohio-976, 108 N.E.3d 744 in support of his argument. The *Wade* court noted that "[a] court, in exercising its [sentencing] discretion under R.C. 2929.03(A), must separately consider the youth of a juvenile offender as a mitigating factor before imposing a sentence of life without parole." *Wade* at ¶60; quoting *State v. Long*, 138 Ohio St.3d 478, 2014-Ohio-849, 8 N.E.3d 890, paragraph one of the syllabus. In *State v. Long*, the Supreme Court of Ohio held in its syllabus as follows with respect to the consideration of youth as a factor in sentencing:

"1. A court, in exercising its discretion under R.C. 2929.03(A), must separately consider the youth of a juvenile offender as a mitigating factor before imposing a sentence of life without parole. (*Miller v. Alabama*, ——U.S. ——, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), followed.)

2. The record must reflect that the court specifically considered the juvenile offender's youth as a mitigating factor at sentencing when a prison term of life without parole is imposed."

{¶92} However, we find the holdings of both *Wade* and *Long* to be inapplicable to the case presently before us for two reasons. First, Appellant was nineteen years old at the time of the offenses. Thus, he was an adult rather than a juvenile offender. Second, Appellant was not sentenced to a term of life in prison without parole. He was sentenced to life in prison with the possibility of parole after thirty years. As such, Appellant, who was twenty at the time the sentence was imposed, may be entitled to parole at age fifty. Moreover, in *Wade*, the State conceded that a prison sentence of "172 and one-half years to life in prison" was the "functional equivalent' of a life-without-parole sentence because it consists of consecutive prison terms exceeding a juvenile's life expectancy." *Wade* at ¶60. This concern is not present in the case sub judice.

{¶93} Further, although the trial court was not required to consider Appellant's age before imposing sentence, a review of the sentencing hearing transcript reveals that the trial court specifically referenced Appellant's age during the sentencing hearing when describing the unfortunate situation of a twenty-year-old being convicted of the aggravated murder of a sixteen-year-old. Thus, the trial court was well-aware of the Appellant's age when it was considering and weighing the sentencing

factors.  Based upon the foregoing, we find no merit to this portion of Appellant's final assignment of error.

{¶94} Next, we consider Appellant's argument that the trial court failed to properly consider the "less serious" factors when balancing the seriousness and recidivism factors under R.C. 2929.12.  Appellant specifically argues the trial court did not properly consider the factors contained in R.C. 2929.12(C)(1)(2)[4] and (4), which are as follows:

> "(C) The sentencing court shall consider all of the following that apply regarding the offender, the offense, or the victim, and any other relevant factors, as indicating that the offender's conduct is less serious than conduct normally constituting the offense:
>
> (1) The victim induced or facilitated the offense.
>
> (2) In committing the offense, the offender acted under strong provocation.
>
> (3) In committing the offense, the offender did not cause or expect to cause physical harm to any person or property.

---

[4] Appellant's brief actually argues the trial court failed to consider the factors contained in R.C. 2929.12(C)(1)(3) and (4), and references that those provisions relate to whether the "victim induced or facilitated the offense," whether "the offender acted under strong provocation," and whether substantial grounds exist "to mitigate the offender's conduct * * *."  However, R.C. 2929.12(C)(2) relates to whether the offender acted under strong provocation, not R.C. 2929.12(C)(3), which has no application here.

(4) There are substantial grounds to mitigate the offender's conduct, although the grounds are not enough to constitute a defense."

{¶95} Appellant argues the trial court did not consider the "less serious" factors based upon its stated reasoning that "the jury didn't buy it, self-defense defense." In Appellant's view, this statement by the trial court "reflects a misunderstanding of the distinction between the role of the jury in the guilt phase of the criminal prosecution, and the judge's role in the sentencing phase[,] primarily that the "less serious" factors contained in the statute "presume the offender has been convicted, but contemplate the presence of circumstances sufficient to mitigate the penalty for the offense of conviction." However, Appellant concedes in his brief that "[a] sentence is not illegal solely because the trial judge did not balance the statutory factors in the manner desired by the defendant." Citing *State v. Butcher*, 4th Dist. Athens Nos. 15CA33, 15CA34, 2017-Ohio-1544, ¶87.

{¶96} In *State v. Yost*, 4th Dist. Meigs No. 17CA10, 2018-Ohio-2719, ¶3, an argument was made that the trial court improperly balanced and weighed the seriousness and recidivism factors in imposing sentence. This Court reasoned, in response to that argument, as follows:

"Although other factors cited by Yost's counsel at the sentencing hearing supported a finding that the offense was less serious or that she would be less likely to commit a future crime, see R.C. 2929.12(C) and (E), the trial court did not need to—as Yost appears to implicitly claim—assign equal weight to each applicable factor. Instead, precedent refutes any contention that each statutory or other relevant factor is entitled to equal or a certain weight in the balancing process. *See State v. Graham*, 4th Dist. Adams No. 17CA1046, 2018-Ohio-1277, ¶25, rejecting the argument that because each of the statutory sentencing factors are mandatory, each is entitled to equal weight on balance, citing *State v. Bailey*, 4th Dist. Highland No. 11CA7, 2011-Ohio-6526, ¶34, quoting *State v. Arnett*, 88 Ohio St.3d 208, 215, 724 N.E.2d 793 (2000) ("in considering the factors set forth in R.C. 2929.12, the trial court has 'the discretion to determine the weight to assign a particular statutory factor"). *Yost* at ¶19.

{¶97} Here, the trial court considered all of the evidence before it, including the information contained in the pre-sentence investigation, and ultimately weighed the seriousness and recidivism, and other sentencing

factors, in favor of a longer prison term before the possibility of parole. We find the fact that the trial court did not consider provocation to be a mitigating factor to be supported by the record in light of our finding Appellant was not entitled to jury instruction on voluntary manslaughter. Further, the trial court's refusal to consider Appellant's claim of self-defense as a mitigating factor, based in part or even wholly upon the jury's rejection of that theory, also finds support in the record in light of testimony introduced by the State contradicting Appellant's claim. Although Appellant's version of events supported a claim of self-defense, the jury rejected it and the trial court was free to reject it as well during the sentencing phase.

{¶98} Ultimately, it has been determined that Appellant's convictions for aggravated murder, murder and felonious assault were not against the manifest weight of the evidence and that the jury's finding of prior calculation and design was supported by sufficient evidence, with no mitigating factors. Thus, based upon the record before us, we cannot conclude that the trial court failed to properly consider or analyze the seriousness and recidivism factors, or that Appellant's sentence was not supported by the record. As a result, we find no merit to the argument raised

under this portion of Appellant's final assignment of error and it is, therefore, overruled.

{¶99} Accordingly, having found no merit in any of the assignments of error raised by Appellant, the judgment of the trial court is affirmed.

**JUDGMENT AFFIRMED.**

# **JUDGMENT ENTRY**

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Pickaway County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. and McFarland, J.: Concur in Judgment and Opinion.

For the Court,

BY: _____
Jason P. Smith, Presiding Judge

## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**